1  JEFFER, MANGELS, BUTLER & MARMARO LLP
   ROBERT C. GEBHARDT (Bar No. 48965)
2  J.T. WELLS BLAXTER (Bar No. 190222)
   Two Embarcadero Center, Fifth Floor
3  San Francisco, California 94111-3824
   Telephone:    (415) 398-8080
4  Facsimile:    (415) 398-5584
   Email:        rgebhardt@jmbm.com
5                wblaxter@jmbm.com

6  Attorneys for Plaintiffs CESSNA EMPLOYEES CREDIT
   UNION, ADVANTAGE PLUS FEDERAL CREDIT UNION,
7  EAST IDAHO CREDIT UNION, HEALTH SERVICES CREDIT
   UNION, IDAHO FALLS TEACHERS CREDIT UNION, LES
8  BOIS FEDERAL CREDIT UNION, CLEARWATER CREDIT
   UNION, SCENIC FALLS FEDERAL CREDIT UNION, and
9  SIMCOE CREDIT UNION, ST. ALPHONSUS MEDICAL
   CREDIT UNION, POCATELLO RAILROAD FEDERAL
10 CREDIT UNION, RACOM COMMUNITY CREDIT UNION and
   TRANSIT EMPLOYEES FEDERAL CREDIT UNION

11

12              UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                SAN FRANCISCO DIVISION

15 CESSNA EMPLOYEES CREDIT UNION; a          CASE NO.    CV 07 5771
   Kansas state chartered credit union;
16 ADVANTAGE PLUS FEDERAL CREDIT
   UNION, a Federally chartered credit union;
17 EAST IDAHO CREDIT UNION, an Idaho state    **COMPENDIUM OF OUT-OF-STATE**
   chartered credit union; HEALTH SERVICES    **AUTHORITY CITED IN SUPPORT OF**
18 CREDIT UNION; an Iowa state chartered credit **PLAINTIFFS' OPPOSITION TO**
   union; IDAHO FALLS TEACHERS CREDIT         **DEFENDANTS MOTION TO DISMISS**
19 UNION, an Idaho state chartered credit union; **FOR LACK OF SUBJECT MATTER**
   and LES BOIS FEDERAL CREDIT UNION; a       **JURISDICTION OR, IN THE**
20 Federally chartered credit union;           **ALTERNATIVE, TO STAY ACTION**
   CLEARWATER CREDIT UNION, an Idaho          **PENDING COMPLETION OF FIRST-**
21 state chartered credit union; SCENIC FALLS  **FILED STATE COURT PROCEEDING**
   FEDERAL CREDIT UNION, a Federally
22 chartered credit union; and SIMCOE CREDIT
   UNION, an Idaho state chartered credit union,
23 ST. ALPHONSUS MEDICAL CREDIT
   UNION, an Idaho state chartered credit union;
24 POCATELLO RAILROAD FEDERAL
   CREDIT UNION, a Federally chartered credit
25 union; RACOM COMMUNITY CREDIT
   UNION, an Iowa state chartered credit union;
26 and, TRANSIT EMPLOYEES FEDERAL
   CREDIT UNION, a Federally chartered credit
27 union,

28              Plaintiffs,

JMBM | Jeffer Mangels Butler & Marmaro LLP

v.

CUNA MUTUAL GROUP, a Wisconsin
corporation and CUMIS INSURANCE
SOCIETY, INC., a Wisconsin corporation,

    Defendants.

1.    Attached hereto as Exhibit "A" is a true and correct copy of *Farmilant v. Singapore Airlines, Ltd.*, 561 F. Supp. 1148 (N.D. Ill. 1983).

2.    Attached hereto as Exhibit "B" is a true and correct copy of *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244 (6th cir. 1996).

3.    Attached hereto as Exhibit "C" is a true and correct copy of *Central Nat'l Bank in Chicago v. Continental Cas. Co.*, 182 F.2d 407 (7th Cir. 1950).

4.    Attached hereto as Exhibit "D" is a true and correct copy of Section 611.223(3) of the Wisconsin Insurance Code.

5.    Attached hereto as Exhibit "E" is a true and correct copy of Section 181.1106 of the Wisconsin Corporations Code.

6.    Attached hereto as Exhibit "F" is a true and correct copy of *Hyatt Int'l. Corp. v. Coco*, 302 F.3d 707 (7th Cir. 2002).

7.    Attached hereto as Exhibit "G" is a true and correct copy of *NSI Corp. vs. Showco, Inc.*, 843 F. Supp. 642 (D. Ore. 1994).

8.    Attached hereto as Exhibit "H" is a true and correct copy of *Associated Mills, Inc. vs. Regina Co.*, 675 F. Supp. 446 (N.D. Ill. 1987)

DATED:  December 21, 2007          JEFFER, MANGELS, BUTLER & MARMARO LLP

By:_____*/s/ J.T. Wells Blaxter*_____
          ROBERT C. GEBHARDT
          J.T. WELLS BLAXTER
      Attorneys for Plaintiff Credit Unions

JMBM | Jeffer Mangels Butler & Marmaro LLP

# EXHIBIT A



561 F.Supp. 1148
561 F.Supp. 1148
**(Cite as: 561 F.Supp. 1148)**

C United States District Court, N.D. Illinois,
Eastern Division.
Eugene FARMILANT, Plaintiff,
v.
SINGAPORE AIRLINES, LTD., Defendant.
**No. 82 C 1270.**

April 15, 1983.

Passenger brought suit against airline alleging fraudulent misrepresentation, tortious breach of contract, negligence and willful and wanton conduct in connection with airline's failure to furnish him passage on flights from Singapore to Madras, India and from Madras back to the United States. Upon airline's motion for summary judgment, the District Court, Shadur, J., held that passenger, who purchased an "open" ticket from Singapore to Madras, India without reservations, could not recover from airline for medical expenses incurred when he became ill after eating food bought from a vendor at a stop on his railroad trip from Bombay to Madras and once the established facts precluded recovery for medical bills, passenger was unable to establish compensatory damages of at least $10,000; furthermore, prayer for punitive damages did not get passenger over jurisdictional hurdle since there was no evil inferable in airline's action even if it was negligent toward him.

Motion denied; action dismissed for lack of subject-matter jurisdiction.

West Headnotes

**Federal Courts** 356
170Bk356Most Cited Cases
Passenger, who purchased an "open" ticket from Singapore to Madras, India without reservations, could not recover from airline for medical expenses incurred when he became ill after eating food bought from a vendor at a stop on his railroad trip from Bombay to Madras and once the established facts precluded recovery for medical bills, passenger was unable to establish compensatory damages of at least

$10,000; furthermore, prayer for punitive damages did not get passenger over jurisdictional hurdle since there was no evil inferable in airline's action even if it was negligent toward him. 28 U.S.C.A. § 1332.
**\*1149** Scott L. David, Engerman, Erlich, Jacobs & Berman, Ltd., Chicago, Ill., for plaintiff.

John B. Lashbrook, Pope, Ballard, Shepard & Fowle, Ltd., Chicago, Ill., for defendant.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Eugene Farmilant ("Farmilant") sues Singapore Airlines, Ltd. ("Airline"), alleging fraudulent misrepresentation, "tortious breach of contract," negligence and willful and wanton conduct in connection with Airline's failure to furnish him passage on flights from Singapore to Madras, India and from Madras back to the United States. Airline has moved for summary judgment. For the reasons stated in this memorandum opinion and order:
    1. Airline's motion is denied.
    2. This Court finds (a) certain "material facts exist without substantial controversy" (Fed.R.Civ.P. ("Rule") 56(d)) and (b) those facts show Farmilant cannot prove damages in excess of $10,000 as required by 28 U.S.C. § 1332.

This action is therefore dismissed for want of subject matter jurisdiction under Rule 12(h)(3).

Summary Judgment Principles
Summary judgment under Rule 56(c) may be granted only if "the record reveals the absence of any genuine issue of material fact." *Sahadi v. Continental Illinois National Bank and Trust Co. of Chicago.* No. 82-1767, 706 F.2d 193 at 196 (7th Cir.1983). But Rule 56(d) contemplates the situation where, on summary judgment motion, the court finds certain "material facts exist without substantial controversy" and other "material facts are actually and in good faith controverted." Although the summary judgment motion must then be denied, the uncontroverted facts are "deemed established" in any "further proceedings." *Id.*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

561 F.Supp. 1148
561 F.Supp. 1148
(Cite as: 561 F.Supp. 1148)

In ascertaining the uncontroverted and controverted facts this Court must grant Farmilant all inferences in his favor from the record, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), including inferences drawn from Airline's submissions, *Thornton v. Evans*, 692 F.2d 1064, 1074-75 (7th Cir.1982). Those favorable inferences, however, must derive from record facts, not from Farmilant's unsupported allegations or suspicions. *See Menefee v. General Electric Co.*, 548 F.Supp. 619, 621 (N.D.Ill.1982).

Uncontroverted Facts

In accordance with Rule 56(d) this Court specifies the following "facts ... appear without substantial controversy" and are "deemed established":

1. On November 12, 1981 [FN1] Farmilant went to Airline's office in Chicago and purchased a ticket for travel as follows: Los Angeles to Tokyo; Tokyo to Singapore; Singapore to Madras; Madras to Singapore; Singapore to Honolulu; and Honolulu to Los Angeles. Complaint Ex. A. Farmilant's ticket allowed a stopover in Tokyo on the outward journey and a stopover in Honolulu on the return trip. Although Farmilant purchased a ticket for the entire trip, he booked a reservation for only the first leg, the December 3 flight from Los Angeles to Tokyo (that was the earliest date on which the applicable fare basis permitted travel). All the rest of the journey was left "open" at Farmilant's request. Farmilant Dep. ("Dep.") 65- 67.

FN1. All subsequent dates without year designations were also in 1981.

2. Farmilant departed for Tokyo from Los Angeles on December 3 and arrived as scheduled. *Id.* at 74. Upon his arrival in *1150 Tokyo, Farmilant decided to change his travel plans to include a stopover in Hong Kong to allow a side trip into the Peoples' Republic of China. On December 7 Farmilant went to Airline's office in Tokyo and booked a December 9 flight to Hong Kong. *Id.* at 76-77. He was issued a new ticket that included passage from Tokyo to Hong Kong, Hong Kong to Singapore, and Singapore to Madras. *Id.* at 77- 78. Farmilant still retained his original ticket to cover passage from Madras back to the United States. Apart from booking a specific flight (Airline's Flight No. 7) from Tokyo to Hong Kong, again Farmilant's new ticket was "open"

beyond the next leg of his continuing trip. And again the open portions of Farmilant's ticket were left open at his request to accommodate his need for flexibility. *Id.* at 76-78.

3. On December 9 Farmilant flew from Tokyo to Hong Kong. *Id.* at 79. Once more he changed his plans and decided not to travel into China. *Id.* at 79-80. On December 11 Farmilant visited Airline's office in Hong Kong to make travel arrangements to Madras. He was booked for a December 13 flight to Singapore. *Id.* at 83, 86. Airline, however, could not make a reservation for Farmilant on the connecting flight from Singapore to Madras. Farmilant was waitlisted on the flight from Singapore. February 1, 1983 Affidavit of Adriaan Arends ¶ 2(c) and (d).

4. Upon arriving in Singapore the evening of December 13 Farmilant tried to get passage on that night's flight to Madras. He was told no seats were available and flights from Singapore to Madras were booked for the next three weeks. Airline made alternative arrangements for Farmilant to fly December 16 from Singapore to Bombay instead of Madras. *See* Dep. 106, 109, 118.

5. From Bombay Farmilant took a December 18 train to Madras. During the train trip Farmilant became ill. He somewhere had "[r]eceived a bad meal and was very ill for 2 days (constant vomiting). Had very bad stomach pains that would not subsist [sic]." *Id.* at 140-41 & Ex. 3. [FN2] Two days after arriving in Madras, Farmilant traveled on by bus to Mahabalipuram, his ultimate destination in India where he intended to study stone sculpture. Farmilant's notation for December 21 reads: "Went to Mahabalipuram (to study Sculpture) [.] Was in so much pain that i [sic] decided the wisest thing to do was go home for medical treatment." *Id.* At that point Farmilant had not sought any medical treatment or taken any medication. Dep. 152.

FN2. Dep.Ex. 3 is a chronological summary prepared by Farmilant for this action.

6. On December 24 Farmilant called Airline in Madras for a reservation on a flight back to the United States. He was told the earliest seat available would not be until February 4, 1982. Dep. Ex. 3. On December 27 Farmilant went to Airline's office in Madras. He claimed he was ill and feared for his

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

561 F.Supp. 1148                                      Page 3
561 F.Supp. 1148
**(Cite as: 561 F.Supp. 1148)**

life. *Id.* After further unsuccessful efforts to get a reservation on one of Airline's flights, Farmilant purchased a ticket for return to the United States on another carrier. *Id.*

7. Farmilant sought medical treatment on his return to Chicago and was later hospitalized for 12 days. Dep. 170-74.

### Farmilant's Damages

If all those facts were recited in a first-year law school examination question (from which they might appear to have been lifted), the most obvious issue for the student to spot would be whether Airline could be liable for any damages associated with Farmilant's illness. Farmilant attributes the illness to food bought from a vendor at a stop on his railroad trip from Bombay to Madras. *Id.* at 140-41. Obviously that intervening or superseding cause would cut off Airline's liability whether Farmilant were proceeding on a tort or a contract theory. Farmilant embarrasses himself when he says (Ans.Mem. 13) "the possibility of his becoming ill during his transportation to Madras was ... reasonably foreseeable by" Airline. Farmilant and his counsel would do well to read any of the host of **\*1151** cases exemplified by *Central of Georgia Ry. Co. v. Price*, 106 Ga. 176, 32 S.E. 77 (1898). *See generally* W. Prosser, *Law of Torts* § 44 (4th ed. 1971).

Once the established facts preclude recovery for Farmilant's medical bills, the only compensatory damages arguably involved are (1) the *extra* living costs incurred by Farmilant from December 13 to 16 in Hong Kong, (2) any *extra* cost incurred by his need to travel by rail from Bombay to Madras (including the price of his adulterated food?) and (3) any *extra* cost incurred by his need to use another carrier for his flight from Madras home. Even in an era of worldwide inflation, those costs of course amount to far less than $10,000. [FN3]

> FN3. Because Farmilant is evidently a man of leisure, planning as he did a relaxed year's sojourn in the Orient (Dep. 58-59), no lost opportunity costs are involved in calculating the damages caused by his delay in reaching Madras. Nor does he advance any such claim.

Farmilant also asks for punitive damages, and maybe he thinks that prayer gets him over the jurisdictional

hurdle. Not so: by a basic common-law principle, punitive or "exemplary" damages are recoverable only when the conduct complained of is accompanied by aggravating circumstances like willfulness, malice or fraud--mere negligence is not enough. *See* 15 I.L.P. Damages § 132. [FN4]

> FN4. As the later text discussion reflects, Farmilant's best argument concerns Airline's alleged negligence in Hong Kong. That raises the question what law Illinois courts would apply to Farmilant's tort and contract claims. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941). As Airline points out (Mem. 12 n. 3), Farmilant has not given notice under Rule 44.1 he intends to raise any foreign law issue. In any event, the discussion here is based on common law principles (they certainly apply in Illinois, and there is no indication they do not also apply in Hong Kong, a British crown colony).

True, Farmilant alleges Airline's fraudulent misrepresentation (Count I), "tortious" breach of contract (Count II), negligence (Count III) and willful and wanton conduct (Count IV). But the established facts preclude Farmilant's showing the requisite fraud, malice or similar aggravating factor on Airline's part.

Were this a threshold motion to dismiss the Complaint for want of subject matter jurisdiction, Farmilant would be entitled to the speculative benefit of any facts he might conceivably prove in support of his well-pleaded allegations. On a motion for summary judgment, though, he is not entitled to hold back his heavier fire for the ultimate trial--for it may never come. *See Walker v. Hoffman*, 583 F.2d 1073, 1075 (9th Cir.1978) (quoting *Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir.1972)), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979). Accordingly Farmilant may properly be accorded the benefit of favorable inferences only from established facts and from his own asserted facts (accepted as true for these purposes)--no more.

Farmilant claims (Dep. 67) he was assured by Airline's Chicago agent he would have "no problem" booking passage throughout the Orient. But Farmilant purchased an "open" ticket without reservations beyond Tokyo. It is not reasonably

561 F.Supp. 1148
561 F.Supp. 1148
**(Cite as: 561 F.Supp. 1148)**

Page 4

inferable the Chicago agent was maliciously motivated to mislead Farmilant in November that he would be unable to obtain a seat on a flight he would choose only at some indefinite time in the future. That point is underlined by the fact Farmilant wound up in Hong Kong (and seeking a particular flight to Madras) only after changing plans twice en route.

Even taking Farmilant's account of Airline's Chicago agent's representation as true, the inference most favorable to Farmilant is of negligence: failure to warn Farmilant that certain permutations in his travel plans might cause him some delays. There was just too much uncertainty at that point to infer from the facts any malice or fraud or evil intent on the agent's part. [FN5]

> FN5. Not surprisingly the agent denies any such misconduct. *See* January 20, 1983 Affidavit of Frances Alexander ¶ 5. For present purposes, though, her denial is not accepted as conclusive simply because she says so. It is rather that *Farmilant* has adduced nothing to support a different conclusion.

**\*1152** It will be recalled Farmilant was only waitlisted on the connecting December 13 flight from Singapore to Madras. Nonetheless he claims (*id.* at 87-89, 104, 108-09) he was assured or led to believe by Airline's agents in Hong Kong he was confirmed on that flight. But he also says (*id.* at 87-88) the Hong Kong agents were not Airline's own employees, but those of another carrier.

That fact certainly permits the inference Airline was negligent in not informing its on-site aides of its codes and its procedures. However, the same fact precludes the possibility *Airline* was acting maliciously or fraudulently through its agents--that it did so specifically to induce Farmilant to buy a ticket that, despite its explicit provision, would really not guarantee him a seat. Airline just did not have that kind of control of its Hong Kong representatives. Moreover, there is no hint Airline had any interest in being stuck with Farmilant in Singapore rather than Hong Kong, and after all Airline did eventually arrange Farmilant's passage to Bombay.

Finally, however much it might have been in Airline's business interest to honor Farmilant's emergency request for transportation back to the

United States, no malice or fraud or wantonness may be inferred from its refusal to "bump" a reserved passenger from one of its flights to accommodate Farmilant. Farmilant was simply not entitled to that preferential right. *See* February 1, 1983 Affidavit of Janis Pignataro, Ex. 1 at ¶¶ A & B.

No doubt Farmilant's excursion to India was beset with woe. Perhaps Airline was negligent toward him. But there just is no evil inferable in this action. Farmilant must simply be told, "Don't try to make a federal case out of it." *See Ross v. Inter-Ocean Insurance Co.,* 693 F.2d 659, 662-63 (7th Cir.1982).

Conclusion
Airline's summary judgment motion is denied. This action is dismissed for lack of subject matter jurisdiction.

561 F.Supp. 1148

END OF DOCUMENT

# EXHIBIT B



89 F.3d 1244
89 F.3d 1244, 1996 Fed.App. 0224P
**(Cite as: 89 F.3d 1244)**

Page 1

United States Court of Appeals,
Sixth Circuit.
MUSSON THEATRICAL, INC., and Modernage
Photo Service, Inc., for themselves and
all others similarly situated, Plaintiffs-Appellants,
v.
FEDERAL EXPRESS CORPORATION, Defendant-
Appellee.
**No. 95-5120.**

Argued March 11, 1996.
Decided July 19, 1996.
As Amended on Denial of Rehearing and Rehearing
En Banc Jan. 15, 1998.

Shipper brought action against air freight carrier alleging claims of federal common-law fraud and misrepresentation, and at same time filed action in state court alleging state law claims against carrier. The United States District Court for the Western District of Tennessee, Odell Horton, J., dismissed action, elected to also exercise jurisdiction over state claims, and dismissed state claims as preempted under Airline Deregulation Act (ADA). Shipper appealed, and the Court of Appeals, Boggs, Circuit Judge, held that: (1) complaint was sufficient to allege existence of federal jurisdiction over fraud claim; but (2) no action for fraud under federal common law existed on part of shipper; and (3) district court could not exercise supplemental jurisdiction over state law claims.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Federal Civil Procedure**  🔑 **1742(1)**
170Ak1742(1)Most Cited Cases
When motion to dismiss based on lack of subject matter jurisdiction attacks face of complaint,

**[1] Federal Civil Procedure**  🔑 **1825**
170Ak1825Most Cited Cases
When motion to dismiss based on lack of subject matter jurisdiction attacks face of complaint,

plaintiff's burden to prove federal question subject matter jurisdiction is not onerous, and plaintiff must show only that complaint alleges claim under federal law and that claim is substantial. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[2] Federal Civil Procedure**  🔑 **1742(1)**
170Ak1742(1)Most Cited Cases
Claim under federal law is "substantial," and may potentially withstand motion to dismiss based on lack of subject matter jurisdiction, unless prior decisions inescapably render it frivolous. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[3] Federal Civil Procedure**  🔑 **1742(1)**
170Ak1742(1)Most Cited Cases
When faced with challenge to face of complaint which is raised through motion to dismiss for failure to state claim, plaintiff can survive motion by showing any arguable basis in law for claim made. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[4] Federal Civil Procedure**  🔑 **1742(2)**
170Ak1742(2)Most Cited Cases

**[4] Federal Courts**  🔑 **243**
170Bk243Most Cited Cases
Allegations by shipper that air freight carrier had represented that its two-day service was cheaper than its overnight service when overnight service was in fact cheaper, and that carrier was accordingly liable for fraud under federal common law were sufficient to allege federal question jurisdiction and to withstand motion to dismiss based on lack of subject matter jurisdiction. Fed.Rules Civ.Proc.Rule 12(b)(1), 28 U.S.C.A.

**[5] Federal Courts**  🔑 **241**
170Bk241Most Cited Cases
Litigant cannot achieve federal jurisdiction merely by writing "federal common law" on complaint.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

89 F.3d 1244　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 2
89 F.3d 1244, 1996 Fed.App. 0224P
**(Cite as: 89 F.3d 1244)**

**[6] Federal Courts** 776
170Bk776Most Cited Cases
Court of Appeals reviews de novo district court's dismissal of action for failure to state claim on which relief can be granted. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[7] Federal Courts** 374
170Bk374Most Cited Cases
Authority to create federal common-law rule without reference to statute or Federal Constitution exists only in such narrow areas as those concerned with rights and obligations of United States, interstate or international disputes implicating conflicting rights of states or relations with foreign nations, and admiralty cases.

**[8] Constitutional Law** 2470
92k2470Most Cited Cases
　(Formerly 92k70.1(1))

**[8] Federal Courts** 5
170Bk5Most Cited Cases
It is not role of federal courts to articulate federal interests, but rather to enforce federal interests identified by Congress, and when federal court creates federal common-law rule, it risks violating both of two fundamental limits on judicial branch of federalism and separation of powers.

**[9] Fraud** 31
184k31Most Cited Cases

**[9] States** 18.15
360k18.15Most Cited Cases
Shipper who alleged that air freight carrier had engaged in fraudulent practices could not bring fraud action under federal common-law fraud against carrier; although Airline Deregulation Act (ADA) contains savings clause, Act also contains express preemption provision, and no evidence existed that Congress intended that courts create federal cause of action for fraud or channel civil actions into federal

courts under ADA. 49 U.S.C.A. §§ 40120(c), 41713(b)(4)(A).

**[10] Fraud** 31
184k31Most Cited Cases

**[10] States** 18.15
360k18.15Most Cited Cases
State law fraud claims are preempted under Airline Deregulation Act (ADA) because Congress intended Department of Transportation (DOT) to be sole legal control on possible advertising fraud by air carriers, and federal common-law fraud claim is inappropriate for same reason. 49 U.S.C.A. § 41713(b)(4)(A).

**[11] Action** 3
13k3Most Cited Cases
Existence of general savings clause in federal statute does not license court to create federal cause of action when plaintiff cannot meet normal requirements for recognition of implied cause of action.

**[12] Courts** 489(1)
106k489(1)Most Cited Cases

**[12] Federal Courts** 14.1
170Bk14.1Most Cited Cases
Federal district court in which action had been brought by shipper alleging claim of fraud under federal common law against air freight shipper could not exercise jurisdiction over state law claims which had been pled by shipper only in Tennessee state court, even though defense of preemption under Airline Deregulation Act (ADA) was potentially applicable to claims; text of ADA does not show congressional intent that federal courts would have exclusive jurisdiction of such actions, as would make defense of complete preemption applicable, and supplemental jurisdiction could not be exercised over claims as they had not been pled in federal court.

**[13] Federal Courts** 29.1
170Bk29.1Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

89 F.3d 1244
89 F.3d 1244, 1996 Fed.App. 0224P
**(Cite as: 89 F.3d 1244)**

Regardless of judicial resources or pleas of parties before it, federal court must proceed with caution in deciding that it has subject matter jurisdiction.

**[14] Federal Courts** 5
170Bk5Most Cited Cases
Constitution allows federal courts only limited and special jurisdiction, and powers not given to federal courts by Congress are reserved to state courts, which are primary repositories of American judicial power.

**[15] Federal Courts** 161
170Bk161Most Cited Cases
Constitutional primacy of state court jurisdiction does not change merely because dispute touches on issues of federal law.

**[16] Federal Courts** 241
170Bk241Most Cited Cases

**[16] Federal Courts** 246
170Bk246Most Cited Cases
For federal jurisdiction to exist, unless citizenship is diverse, plaintiff's well-pleaded complaint must raise issue "arising under" laws of United States; presence of federal defense is inadequate.

**[17] Federal Courts** 246
170Bk246Most Cited Cases

**[17] States** 18.3
360k18.3Most Cited Cases
"Complete preemption" applies as basis for exercise of federal jurisdiction only in extraordinary circumstance when Congress intends, not merely to preempt certain amount of state law, but also to transfer jurisdiction to decide preemption question from state to federal courts, and without evidence of Congress' intent to transfer jurisdiction to federal courts, there is no basis for invoking federal judicial power in such a case.

**[18] Courts** 489(1)
106k489(1)Most Cited Cases
Aviation Deregulation Act (ADA) does not indicate congressional intent to have federal courts exercise exclusive subject matter jurisdiction over preemption defenses to state law claims against air carriers under application of doctrine of complete preemption.

**[19] Federal Civil Procedure** 673
170Ak673Most Cited Cases
While modern pleading rules may be lax, they still require that party plead claim before court decides it.

**[20] Federal Courts** 14.1
170Bk14.1Most Cited Cases
Provision of Federal Rules of Civil Procedure calling for complaint to contain short and plain statement of grounds upon which court's jurisdiction depends requires, at minimum, that plaintiff identify state claims as such, or cite to statutory supplemental jurisdiction rule. 28 U.S.C.A. § 1367; Fed.Rules Civ.Proc.Rule 8, 28 U.S.C.A.

**[21] Federal Courts** 18
170Bk18Most Cited Cases
No unusual circumstances existed warranting exercise by district court of supplemental jurisdiction over state law claims, which had been pled only in state court, asserted by shipper against air freight carrier following dismissal for failure to state claim by court of fraud action asserted under federal common law by shipper, even though affirmative defense of federal preemption under Airline Deregulation Act (ADA) was potentially applicable; state court was better forum for claims, preemption issue was not so clear as to make state law claims patently frivolous, and state court action was already pending. 28 U.S.C.A. § 1367(c)(3); Fed.Rules Civ.Proc.Rule 12(b)(6), 28U.S.C.A.

**[22] Federal Courts** 14.1
170Bk14.1Most Cited Cases
While district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims, that discretion is bounded by constitutional and prudential limits on use of federal

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

89 F.3d 1244                                                                 Page 4
89 F.3d 1244, 1996 Fed.App. 0224P
**(Cite as: 89 F.3d 1244)**

judicial power.

**[23] Federal Courts** 🔑 18
170Bk18Most Cited Cases

**[23] Removal of Cases** 🔑 101.1
334k101.1Most Cited Cases
While supplemental jurisdiction statute provides that
court may, rather than must, decline to exercise
jurisdiction if all claims over which it had original
jurisdiction have been dismissed, when all federal
claims are dismissed before trial, balance of
considerations usually will point to dismissing state
law claims, or remanding them to state court if action
was removed. 28 U.S.C.A.§ 1367(c)(3).

**[24] Federal Courts** 🔑 18
170Bk18Most Cited Cases
While vast majority of pretrial dismissals do not
affect district court's ability to resolve supplemental
claims, where dismissal is for lack of subject matter
jurisdiction, supplemental jurisdiction can never
exist, and if dismissal is for failure to state claim,
strong presumption exists in favor of dismissing
supplemental claims. 28 U.S.C.A. § 1367(c)(3);
Fed.Rules Civ.Proc.Rule 12(b)(1, 6), 28 U.S.C.A.

**[25] Federal Courts** 🔑 18
170Bk18Most Cited Cases
Presumption that district court should decline to
exercise supplemental jurisdiction where original
claims are dismissed for failure to state claim is based
on two reasons; dismissal for failure to state claim
usually comes early in proceedings, when court has
not yet invested great deal of time into resolution of
state claims, and implies that substance of federal
claims was somehow lacking even if claims were
sufficient to survive motion for dismissal
based on lack of subject matter jurisdiction. 28
U.S.C.A. § 1367(c)(3); Fed.Rules Civ.Proc.Rule
12(b)(6), 28 U.S.C.A.

**[26] Federal Courts** 🔑 18
170Bk18Most Cited Cases
Presumption that dismissal of touchstone claims for

failure to state claim precludes exercise of
supplemental jurisdiction over any remaining claims
by federal court can be overcome in unusual
circumstances. 28 U.S.C.A. § 1367(c)(3); Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.
**\*1247**Cornish F. Hitchcock (argued), Public Citizen
Litigation Group, Washington, DC, William L.
Gibbons, Evans & Petree, Memphis, TN, Lisa M.
Mezzetti (briefed), Herbert E. Milstein, Cyrus Mehri
(briefed), Cohen, Milstein, Hausfeld & Toll,
Washington, DC, Alan R. Markizon, Coeur D'Alene,
ID, David J. Guin, Hogan, Smith & Alspaugh,
Birmingham, AL, for Musson Theatrical, Inc.,
Modernage Photo Service, Inc.


Earle J. Schwarz, Waring Cox, Memphis, TN,
Clifford P. Johnson, Federal Express Corp.,
Memphis, TN, Lee Ann Huntington, Robert B.
Mullen(briefed), Eliot S. Jubelirer (argued),
Morgenstein & Jubelirer, San Francisco, CA, for
Federal Express Corp.


Before: JONES, BOGGS, and BATCHELDER,
Circuit Judges.


BOGGS, Circuit Judge.


The plaintiffs ("Musson") appeal the dismissal of
federal common law claims of fraud and
misrepresentation against Federal Express. Musson
also appeals the district court's ruling that state
common law claims against Federal Express, pending
in a simultaneous state court proceeding, are
preempted by the Airline Deregulation Act of 1978.
We affirm the district court's dismissal of Musson's
federal claims for lack of subject matter jurisdiction,
but vacate its ruling concerning Musson's state law
claims and direct that the district court dismiss these
claims without prejudice.

**I**

Musson claims that it purchased "FedEx Economy
Two-Day Service" rather than "Standard Overnight
Service" because Federal Express represented that the
former was cheaper. In fact, says Musson, "Standard
Overnight Service" is cheaper, and Musson ended up
paying a higher price for slower delivery. Musson
filed a complaint in the district court alleging that
these facts **\*1248** entitle it to damages for "common
law fraud" and "negligent misrepresentation."

Musson did not try to find a basis for federal subject

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

89 F.3d 1244
89 F.3d 1244, 1996 Fed.App. 0224P
(Cite as: 89 F.3d 1244)

Page 5

matter jurisdiction in the extensive statutory scheme that regulates the rates and advertising practices of air carriers. In fact, Musson conceded that there is no express or implied right of action against an air carrier for deceptive advertising under the relevant statutes. Musson Brief at 7. *Accord Statland v. American Airlines,* 998 F.2d 539 (7th Cir.1993) (no private right of action for deceptive advertising action against airline under the Airline Deregulation Act of 1978). Instead, Musson pled subject matter jurisdiction under "the federal common law." Musson Brief at 7. Federal Express filed a motion to dismiss under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, and under Rule 12(b)(6) for failure to state a claim. The district court held that the federal common law does not contain a right of action for fraud against an air carrier, and dismissed Musson's federal claims under Rule 12(b)(1) for lack of subject matter jurisdiction.

## II

We must first decide, reviewing *de novo,* if the dismissal of Musson's claims under Rule 12(b)(1) was proper. Musson contends that the court should have dismissed its claims, if at all, under 12(b)(6) for failure to state a claim upon which relief can be granted. Musson argues that a federal court always has jurisdiction to decide if a claim exists under federal common law and, if such a claim exists, a federal court certainly has jurisdiction over it. *See Illinois v. City of Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 1391, 31 L.Ed.2d 712 (1972) (federal question jurisdiction exists for claims under federal common law).

[1][2][3][4] When a 12(b)(1) motion attacks the face of a complaint, the plaintiff's burden to prove federal question subject matter jurisdiction is not onerous. *RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1134 (6th Cir.1996) (discussing 12(b)(1) motions that attack jurisdictional facts, the standard of review of such motions, and when they should be converted to motions for summary judgment). The plaintiff must show only that the complaint alleges a claim under federal law, and that the claim is "substantial." A federal claim is substantial unless " 'prior decisions inescapably render [it] frivolous.' " *Transcontinental Leasing, Inc. v. Michigan National Bank of Detroit,* 738 F.2d 163, 165 (6th Cir.1984). [FN1] In short, when faced with a 12(b)(1) challenge to the face of a complaint, the plaintiff can survive the motion by showing any arguable basis in law for the claim made.

FN1. We choose to equate "substantial" with non-frivolous because other definitions of substantial are circular. *E.g. Hagans v. Lavine,* 415 U.S. 528, 542-43, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974) ("the test is whether the cause of action alleged is so patently without merit as to justify ... the court's dismissal for want of jurisdiction.") (internal citations omitted); *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974) (test is whether right claimed is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy."). This precedent does little more than say that dismissal is appropriate when the claim is so weak as to make dismissal appropriate.

[5] In the present case, Musson's argument is novel, but not frivolous. No case has ever recognized a federal common law action for fraud against an air carrier. However, the law is hardly static--and a federal court has jurisdiction to hear claims on the margins of reasonable possibility. Federal courts have created other common law rules to regulate the relationship between air carriers and their customers, as discussed below. Furthermore, Musson argues that a cause of action is necessary because of the relatively new preemption provision of the Airline Deregulation Act of 1978. An accurate understanding of the meaning of this preemption provision requires careful analysis. For these reasons, the dismissal of Musson's federal common law claim for lack of federal question jurisdiction on the face of the complaint was an error. We caution that a litigant cannot achieve federal jurisdiction merely by writing "federal common law" on a complaint--but in this case Musson offers reasoned arguments why a cause of action *1249 should exist, and these arguments warrant a careful response. As the Supreme Court has held, a non-frivolous claim "confers power to decide that it has no merit, as well as to decide that it has." *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951).

## III

[6] As it does not make any difference to the outcome of this case, we shall construe the district court's dismissal of Musson's federal claims as a dismissal

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

89 F.3d 1244                                                                                                                                     Page 6
89 F.3d 1244, 1996 Fed.App. 0224P
**(Cite as: 89 F.3d 1244)**

under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. [FN2] We review *de novo* a district court's dismissal under 12(b)(6). *Wright v. MetroHealth Medical Ctr.,* 58 F.3d 1130, 1138 (6th Cir.1995). The only dispute is whether a shipper that alleges it was injured by the fraud and deceptive advertising of an air carrier states a claim under federal common law.

> FN2. Of course, a 12(b)(6) dismissal, as opposed to a dismissal under 12(b)(1), may constitute a resolution of Musson's claims on the merits. The possible preclusive effect of this change in nomenclature does not worry us because that preclusive effect could obviously not extend to the state law claims that we, later in this opinion, order dismissed on jurisdictional grounds without prejudice.

The usual source of authority for federal common law rules governing a suit between private parties is a federal statute. The plaintiffs, however, concede that the relevant statutory framework provides no cause of action. Another source of authority is the Constitution. *E.g., Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The plaintiffs, however, have not argued that the logic of our Constitutional structure requires the federal right of action they seek.

[7] Sometimes federal courts have created federal common law to govern a suit between private parties without explicit reference to either a statute or the Constitution. In these cases, however, the federal common law rule has been necessary to "protect a uniquely federal interest." *Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981) (earlier sources omitted). We have held that the authority to create a federal common law rule without reference to a statute or the Constitution exists only "in such narrow areas as those concerned with the rights and obligations of the United States, interstate or international disputes implicating the conflicting rights of the States or relations with foreign nations, and admiralty cases." *Smith v. Dearborn Financial Servs., Inc.,* 982 F.2d 976, 981 (6th Cir.1993). *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (applying "act of state" doctrine to Cuban nationalization of industry); *Clearfield Trust Co. v. United States,* 318

U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (duty of United States in regard to commercial paper issued by it).

Musson contends that we should create a federal common law action here because "[c]arrier-shipper relations, the topic of this case, [are] one such enclave where there is a body of federal common law that controls the respective liabilities of interstate air carriers and shippers." Musson Brief at 17. In one respect, Musson is correct. There are a variety of federal common law rules that govern certain aspects of the relationship between shippers and air carriers. For example, a federal common law rule allows air carriers to limit by contract their liability for losses, *Hampton v. Federal Express Corp.,* 917 F.2d 1119, 1121 (8th Cir.1990), and a federal common law rule determines carrier liability to persons travelling on a free pass, *Thompson v. National R.R. Passenger Corp.,* 621 F.2d 814, 819-20 (6th Cir.), *cert. denied,* 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980). These cases indicate that there is some federal interest in uniform rules regulating the pricing practices of air carriers. Assuming that this federal interest is substantial *enough,* a federal court could create a federal common law rule (even an entirely new federal common law cause of action) to serve these articulated federal interests without violating principles of federalism. [FN3]*Cf.* *1250*Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966) (federal common law should supplement or replace state common law only when there is a "significant conflict" between the state law and federal policy).

> FN3. However, the federal interest would have to be rather extraordinary to warrant the creation of an entire cause of action. All the cases cited by Musson concern the use of federal law in a state law cause of action. An occasional rule--usually a defense--is far less intrusive as a matter of federalism than the creation of a cause of action. The latter both changes the substantive law applicable between private citizens *and* provides a basis for federal question jurisdiction in federal courts.

[8][9] What Musson misses, however, is that it is not the role of federal courts to articulate federal interests--but to enforce the federal interests identified by Congress. When a federal court creates a federal common law rule, it risks violating *both* of

89 F.3d 1244
89 F.3d 1244, 1996 Fed.App. 0224P
(Cite as: 89 F.3d 1244)

Page 7

the two fundamental limits on the judicial branch: federalism and the separation of powers. Musson might convince us that it would not offend federalism for us to draft a federal cause of action for deceptive advertising. However, Musson must also convince us that such a holding would be consistent with our limited role in the federal government. Here, Musson fails.

Prior to 1938, this country relied on common law doctrines of contract and tort to regulate the rates and advertising practices of air carriers. "Common law" at this point meant *either* federal or state commercial common law, depending on the court in which an action was brought.  *Cf. Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (ending "general" federal common law).  In 1938, Congress passed the Civil Aeronautics Act, 52 Stat. 973, which set up a system of tariffs for air carriers.  The Act contained a savings clause stating that nothing in the Act would "in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."  49 U.S.C.App. § 1506.  As a result, certain *state* common law actions remained possible throughout the period when the Civil Aeronautics Act was operative.  Musson, however, has failed to present one example of a *federal* common law cause of action against air carriers during this period.  We do not find this absence of precedent surprising in light of the teaching of *Erie.*

In 1958, Congress passed the Federal Aviation Act (FAA), 72 Stat. 731, 49 U.S.C.App. § 1301 *et seq.* (1988 ed. and Supp. V).  The Act set up a comprehensive federal regulatory scheme governing air carriers.  Part of this scheme allowed consumers to bring complaints about deceptive advertising to the Civil Aeronautics Board, which had the power to bring a variety of enforcement actions.  Like the Civil Aeronautics Act before it, the FAA had a savings clause that preserved some state common law actions.  49 U.S.C.App. § 1506 ("A remedy under this part is in addition to any other remedies provided by law.").  Because of the savings clause, a party could sue an airline for fraud under state common law, despite the ability to petition the Civil Aeronautics Board for an administrative remedy.  *Nader v. Allegheny Airlines,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976).  Also because of the savings clause, courts applied federal common law rules concerning liability limits in cases under state law.  *Klicker v. Northwest Airlines, Inc.,* 563 F.2d

1310, 1314 (9th Cir.1977) (striking air carrier's contractual limit on liability for loss of live animal in transport).  Again, Musson has failed to cite a single case suggesting a federal common law cause of action against air carriers during this period.

In 1978, Congress passed the Airline Deregulation Act (ADA), 92 Stat. 1705.  The ADA eliminated the authority of the Civil Aeronautics Board.  Subsequent legislation, however, transferred the Board's authority to protect consumers against deceptive advertising practices to the Department of Transportation.  CAB Sunset Act of 1984, Pub.L. No. 98-443, 98 Stat. 11706 (1984).  *See also* H.R.Conf.Rep. No. 793, 98th Cong., 2d Sess. (1978), *reprinted in* 1984 U.S.C.C.A.N. 2857, 2860 (explaining rationale for change).  Currently, any person may file a complaint with the Department of Transportation, and the Department of Transportation, in its discretion, can prosecute actions against carriers for "unfair and deceptive practices."  49 U.S.C. § 41712.  Although *1251 DOT cannot award a complaining party "damages," *Pinehurst Airlines, Inc. v. Resort Air Servs., Inc.,* 476 F.Supp. 543, 548 (M.D.N.C.1979), it can seek civil penalties of up to $1,000 per violation, 49 U.S.C. §§ 1155, 46301.  *See also American Airlines, Inc. v. Wolens,* 513 U.S. 219, ----, 115 S.Ct. 817, 823 n.4, 130 L.Ed.2d 715 (1995) (noting that DOT assessed more than $1.8 million in civil penalties in aviation enforcement proceedings in 1993).

Like the FAA before it, the ADA contains a savings clause.  49 U.S.C. § 40120(c) ("A remedy under this part is in addition to any other remedies provided by law.").  Unlike the FAA, however, the ADA also contains an express preemption provision, recently recodified at 49 U.S.C. § 41713(b)(4)(A) ("[A] state ... may not enact or enforce any law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier....").  Interpreting this provision, the Supreme Court has held that the ADA preempts certain state law fraud claims, but not state law contract claims.  *American Airlines,* 513 U.S. at ----, 115 S.Ct. at 823-24.  Again, Musson has failed to cite a single case since 1978 that suggests a federal common law cause of action for fraud against air carriers.

Of course, the simple lack of precedent during any of these periods is not fatal to Musson's claim.  If Congress, by adopting and re-adopting the savings clause, clearly expressed an intent that courts create a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

89 F.3d 1244
89 F.3d 1244, 1996 Fed.App. 0224P
(Cite as: 89 F.3d 1244)

federal cause of action for fraud, then we would not fail to create that cause of action simply because a particular set of circumstances has not yet occurred. However, there is not a shred of evidence that Congress, when passing any of the three statutes described above, intended the statutory scheme to exist side-by-side with a federal cause of action for air carrier fraud. In fact, the legislative history of the CAB Sunset Act "establishes that DOT, not private parties, will enforce consumer protection rules against airlines." *Statland,* 998 F.2d at 541. Without a specific congressional instruction to the courts, Musson's argument essentially becomes a plea that we hold that the three successive savings clauses overrule *Erie* (at least as it is applicable to air freight), resurrecting the federal courts' ability to decide cases according to their own ideas about appropriate commercial law principles. Here Musson encounters two obstacles: (i) the same lack of Congressional intent; and (ii) the *constitutional* tenor of *Erie* 's mandate to refrain from avoidable judicial lawmaking. 304 U.S. at 77-78, 58 S.Ct. at 822.

Moreover, the Supreme Court has expressly rejected the possibility that the ADA leaves room for a federal common law cause of action against air carriers, at least in regard to breach of contract claims: "Nor is it plausible that Congress meant to channel into federal courts the business of resolving, pursuant to judicially fashioned federal common law, the range of contract claims relating to airlines rates, routes, or services." *American Airlines,* 513 U.S. at ----, 115 S.Ct. at 825. Musson argues that this statement is not important because it deals with contract claims rather than fraud claims. It makes sense, says Musson, to hold that there is no federal common law action for breach of contract because such actions can be brought under state law. It does not make sense, however, to hold that there is no federal common law action for fraud, because state law fraud claims might be preempted under American Airlines, and a plaintiff would be left with no recourse.

[10] We do not agree. State law fraud claims are preempted (although we do not comment on the extent of such preemption here) because Congress intended DOT to be the sole legal control on possible advertising fraud by air carriers. A federal common law fraud claim is inappropriate for the same reason. *See American Airlines,* 513 U.S. at ----, 115 S.Ct. at 823 (describing "the ADA's purpose to leave largely to the airlines themselves ... the selection and design of marketing mechanisms appropriate to the

furnishing of air transportation services"). *Accord Statland,* 998 F.2d at 541; *Vail v. Pan Am Corp.,* 260 N.J.Super. 292, 616 A.2d 523, 527 (1992); *Howard v. Northwest Airlines, Inc.,* 793 F.Supp. 129, 132 (S.D.Tex.1992). Broadly because the Supreme Court's statement in *American Airlines,* we therefore hold that the ADA, unlike ERISA, does not "channel civil actions into federal courts," *1252 513 U.S. at ----, 115 S.Ct. at 825, whether those actions allege breach of contract or fraud.

[11] There is an additional problem with what Musson now asks this court to do. In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087-88, 45 L.Ed.2d 26 (1975), and its many progeny, the Supreme Court developed a test for when a private right of action can be implied from the text or scheme of a federal statute. Every court faced with the question of whether a consumerprotection provision of the ADA allows the implication of a private right of action against an airline has answered the question in the negative. *Statland,* 998 F.2d at 539 (49 U.S.C. § 1381(b)); *Montauk-Caribbean Airways, Inc. v. Hope,* 784 F.2d 91, 97 (2d Cir.), cert. denied, 479 U.S. 872, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986) (49 U.S.C. § 1349); *Polansky v. Trans World Airlines, Inc.,* 523 F.2d 332, 338-40 (3rd Cir.1975) (49 U.S.C. § 1381(a)). Essentially, Musson asks us to ignore *Cort v. Ash* and imply a cause of action for violation of an obligation expressed in a federal statute according to the more flexible law about when and how a court can create miscellaneous federal common law rules. We refuse to do so. The existence of a general savings clause in a federal statute does not license a court to create a federal cause of action when the plaintiff cannot meet the normal requirements of *Cort v. Ash.* Cf. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 23, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) (the "dispositive question remains whether Congress intended to create any such remedy"); *Statland,* 998 F.2d at 540 (Plaintiff "cannot bootstrap consumers' rights into a law that does not mention them"). In light of evidence that Congress intended Musson to have no federal civil remedy, we will not use the savings clause to create such a remedy under the rubric of "federal common law."

**IV**

[12] On the same day that Musson filed its federal complaint, Musson also filed a complaint alleging violations of state law in the Chancery Court of Shelby County, Tennessee. Federal Express asked

the federal district court to declare that these state claims were preempted by federal law. Although *none of these claims had been pled in federal court*, the district court exercised jurisdiction over them "[i]n order to conserve judicial resources." Order, November 17, 1994, at 8. The court ordered that "since the plaintiffs' state law claims relate to rates and services, those claims are preempted pursuant to the Airline Deregulation Act, 49 U.S.C. § 1305(a)(1)." Order at 12.

[13][14][15][16] We hold that the district court erred in resolving Musson's state law claims. Regardless of "judicial resources" or the pleas of the parties before it, a federal court must proceed with caution in deciding that it has subject matter jurisdiction. *Healy v. Ratta*, 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934). The Constitution allows federal courts only a limited and special jurisdiction, and powers not given to the federal courts by Congress are reserved to the primary repositories of American judicial power: state courts. *Gross v. Hougland*, 712 F.2d 1034, 1036 (6th Cir.1983) (citing *Owen Equip. and Erection Co. v. Kroger*, 437 U.S. 365, 372, 98 S.Ct. 2396, 2401-02, 57 L.Ed.2d 274 (1978)). The constitutional primacy of state court jurisdiction does not change merely because a dispute touches on issues of federal law. *Gully v. First National Bank*, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1936); *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908). For federal jurisdiction to exist, unless citizenship is diverse, a plaintiff's well-pleaded complaint must raise an issue "arising under" the laws of the United States; the presence of a federal *defense* is inadequate. *Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 9-12, 103 S.Ct. 2841, 2846-48, 77 L.Ed.2d 420 (1983). The question of preemption at issue in this case is merely another federal defense. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). We must assume that a state court, subject to review by writ of certiorari, can resolve such a defense as ably as could a federal district court.

Reviewing the record in this case, we find no acceptable basis for subject matter jurisdiction. **\*1253** The district court's opinion obliquely mentions two possibilities: that the state claims were "completely preempted," and that the state claims were impliedly pled and properly pendent. We can accept neither theory.

**V**

In the middle of its opinion, the district court implies that Musson's state law claims were "completely preempted" by the ADA's preemption provision, 49 U.S.C. § 1305. The district court writes: "Inasmuch as § 1305 applies, there is exhibited a congressional intent to treat plaintiffs' complaint as 'federal in character' by its very nature invoking subject matter jurisdiction." Order at 11. The district court then cites *Metropolitan Life*, 481 U.S. at 63-64, 107 S.Ct. at 1546-47, a case in which the Supreme Court applied the "complete preemption" exception to the well-pleaded complaint rule. *Id.*, 481 U.S. at 63-67, 107 S.Ct. at 1546-48 (ERISA gives federal courts jurisdiction to decide preemption defense to certain state law claims). *See also Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968) (LMRA gives federal courts jurisdiction to decide preemption defense to certain state law claims).

[17] If we read the district court's reference to "complete preemption" doctrine as a holding that the ADA completely preempts Musson's state law claims and confers jurisdiction on the federal courts to hear them, that holding is erroneous and must be set aside. "Complete preemption" applies only in the *extraordinary* circumstance when Congress intends, not merely to preempt a certain amount of state law, but also to transfer jurisdiction to decide the preemption question from state to federal courts. *See Metropolitan Life*, 481 U.S. at 65-66, 107 S.Ct. at 1547-48 (finding a statement of such intent in the legislative history). Without evidence of Congress's intent to transfer jurisdiction to federal courts, there is no basis for invoking federal judicial power. *Strong v. Telectronics Pacing Systems, Inc.*, 78 F.3d 256, 259 (6th Cir.1996).

[18] Examining the text of the ADA and its legislative history, we see no evidence that Congress intended the federal courts to have exclusive subject matter jurisdiction over the preemption defenses to state law claims against air carriers. Quite to the contrary: if the Supreme Court was correct to state that the ADA, unlike ERISA, did not intend to "channel actions into federal court," *American Airlines*, 513 U.S. at ----, 115 S.Ct. at 825, then *only* a state court, or a federal court sitting in diversity, is an appropriate forum for resolution of Musson's claims.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

89 F.3d 1244                                                                    Page 10
89 F.3d 1244, 1996 Fed.App. 0224P
**(Cite as: 89 F.3d 1244)**

## VI

[19][20] The district court's opinion also implies that it had jurisdiction over Musson's state law claims under the doctrine of supplemental jurisdiction, now partly codified at 28 U.S.C. § 1367. The obvious problem with the exercise of supplemental jurisdiction over Musson's state law claims is that *Musson never pled these claims in the district court.*

The complaint merely asserts rights "under the common law." One might read this as encompassing both federal and state law claims were it not for a footnote in the complaint informing the court that:

The Plaintiffs in this action, on this day, have filed a complaint under state law in the Chancery Court of Shelby County Tennessee (Tenth Chancery Division at Memphis) to protect their interests and those of the proposed Class should it be decided that this cause of action should be filed under state and not Federal law.

Complaint at 2 n.1. At oral argument, both the defendant and the plaintiff told this court that state law claims were "impliedly" pled (without citing a source in the complaint for such an implication), and that supplemental jurisdiction was proper for this reason. We disagree. Modern pleading rules may be lax, but they still require that a party plead a claim before the court decides it. Furthermore, Fed.R.Civ.P. 8 requires the complaint to contain "a short and plain statement of the grounds upon which the court's jurisdiction depends." At a minimum, this requires a plaintiff to identify state claims as such, or to **\*1254** cite the supplemental jurisdiction rule at 28 U.S.C. § 1367.

Fed.R.Civ.P. 15 allows easy and liberal amendment of the complaint to encompass additional claims. We might find appellate correction of the district court's error unnecessary because the district court could rectify its own mistake on remand by accepting an amendment to the complaint that adds the state law claims. See *Carney v.* http://www.westlaw.com/Find/Default.wl?rs =FIPI1.0&vr=2.0&DB=506&FindType=Y& ReferencePositionType=S&SerialNum=199 4084597&ReferencePosition=954*Resolution Trust Corp.,* 19 F.3d 950, 954 (5th Cir.1994) (citing 3 James W. Moore et al., Moore's Federal Practice 15-154 (2d ed. 1993) (an amendment that changes the jurisdictional basis of an action will relate back to the date of the original complaint if the factual situation alleged otherwise remains unaltered); 6A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 1497, at 80 (2d ed. 1990) ("Amendments curing a defective statement of subject matter jurisdiction ... will relate back.")).

[21] However, there is a second problem with the district court's assertion of supplemental jurisdiction over the unpled state law claims. On the particular facts of this case, it was an abuse of discretion to retain the state law claims on a theory of supplemental jurisdiction after dismissal of the federal claims upon which supplemental jurisdiction depended.

*United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16L.Ed.2d 218 (1966) established the doctrine of supplemental jurisdiction as a matter of federal common law. Essentially, *Gibbs* held that a federal court can decide a state law claim that forms part of the same "case or controversy" as a claim over which the court has jurisdiction. *Ibid.* Since *Gibbs,* federal courts have expanded and shaped the doctrine of supplemental jurisdiction by applying it to new circumstances. In 1990, Congress passed a supplemental jurisdiction statute, now codified at 28 U.S.C. § 1367. Although § 1367 overruled *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989) (restrictions on jurisdiction over third parties), the statute affirmed *Gibbs,* as interpreted by subsequent federal courts, as the proper measure of federal supplemental jurisdiction. 28 U.S.C.A. § 1367, Practice Commentary at 829 (1993). *See Purgess v. Sharrock,* 33 F.3d 134, 139 (2d Cir.1994) ("Section 1367(c) is consistent with earlier case law on this subject...."); *Timm v. Mead Corp.,* 32 F.3d 273, 276 (7th Cir.1994) ("Section 1367 was 'intended to codify rather than to alter the judge-made principles of pendent and pendent party jurisdiction.' ") (citing *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir.1993)).

[22] A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims. *Transcontinental Leasing, Inc. v. Michigan Nat'l Bank of Detroit,* 738 F.2d 163, 166 (6thCir.1984). That discretion, however, is bounded by constitutional and prudential limits on the use of federal judicial power. *Gibbs* itself expressed one of the most important of these limits: "Certainly, if the federal claims are dismissed before trial, even though [the federal claims are] not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

89 F.3d 1244
89 F.3d 1244, 1996 Fed.App. 0224P
(Cite as: 89 F.3d 1244)

Page 11

The word "certainly" was effectively erased by _Rosado v. Wyman_, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). The Court held that a district court did not abuse its discretion in retaining jurisdiction over supplemental state law claims after it dismissed the touchstone federal claim for mootness before trial. 397 U.S. at 405, 90 S.Ct. at 1214. _Rosado_ held that there is no categorical rule that the pretrial dismissal of a federal claim bars a court from deciding remaining state law claims. _Ibid._ Instead, the decision depends on "judicial economy, convenience, fairness, and comity." _Carnegie-Mellon Univ. v. Cohill_, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988). This approach was codified at 28 U.S.C. § 1367(c)(3), which provides that a district court "may" (rather than must) decline to exercise jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction."

[23] As a rule of thumb, however, the _Gibbs_ dictum remains valid. When all federal claims are dismissed before trial, the balance of considerations usually will point to *1255 dismissing the state law claims, or remanding them to state court if the action was removed. _Carnegie-Mellon_, 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7. _Accord Wright v. Associated Ins. Cos., Inc._, 29 F.3d 1244, 1251 (7th Cir.1994); _Purgess v. Sharrock_, 33 F.3d at 138; _Timm v. Mead Corp._, 32 F.3d at 276. This court has consistently applied _Gibbs_ 's amended dictum. _Taylor v. First of America Bank-Wayne_, 973 F.2d 1284, 1287 (6th Cir.1992) ("when 'all federal claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction....' " (citing _Carnegie-Mellon_, 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7)); _Aschinger v. Columbus Showcase Co._, 934 F.2d 1402, 1412 (6th Cir.1991) (only "overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim even if the federal claim has been dismissed before trial."); _Gaff v. Federal Deposit Ins. Corp._, 814 F.2d 311, 319 (6th Cir.1987) ("It is generally recognized that where, as in this case, federal issues are dismissed before trial, district courts should decline to exercise pendent jurisdiction over state law claims.").

[24] A close look at precedent indicates that not all "pretrial dismissals" affect supplemental claims in the same manner. The vast majority of pretrial dismissals, such as a dismissal on a motion for summary judgment, do not affect the trial court's ability to resolve supplemental claims. But there are two types of pretrial dismissals that appellate courts have scrutinized closely. The first is a dismissal under Rule 12(b)(1). If the court dismisses plaintiff's federal claims pursuant to Rule 12(b)(1), then supplemental jurisdiction can _never_ exist. A Rule 12(b)(1) dismissal postulates that there never was a valid federal claim. Exercise of jurisdiction on a theory of supplemental jurisdiction would therefore violate Article III of the Constitution, because the original federal claim would not have "substance sufficient to confer subject matter jurisdiction on the court." _Gibbs_, 383 U.S. at 725, 86 S.Ct. at 1138. _See also_ _Bigelow v. Michigan Dep't of Natural Resources_, 970 F.2d 154, 159 (6th Cir.1992) (dismissal for lack of ripeness equivalent to dismissal for lack of subject matter jurisdiction; state law claims cease to be properly supplemental). Obviously, a district court has no discretion to exceed the scope of its Article III power.

[25] The second type of problematic pretrial dismissal is a dismissal under Rule 12(b)(6) for failure to state a claim. After a 12(b)(6) dismissal, there is a strong presumption in favor of dismissing supplemental claims. _Taylor_, 973 F.2d at 1287 (dictum); _Vild v. Visconsi_, 956 F.2d 560, 570 (6th Cir.1992) (dictum); _Aschinger_, 934 F.2d at 1412 (dictum); _Gaff_, 814 F.2d at 319 (reversing district court's decision to exercise supplemental jurisdiction over state claim after federal claim dismissed under 12(b)(6)). There are two reasons for this presumption. First, a 12(b)(6) dismissal usually comes early in the proceedings, when the court has not yet invested a great deal of time into resolution of the state claims. Second, a 12(b)(6) dismissal implies that the substance of the federal claims was somehow lacking, even if the claims were sufficient to survive a motion for dismissal under 12(b)(1). _Aschinger_, 934 F.2d at 1412 (dictum) ("[w]hen a case is dismissed for failure to state a federal claim, as in [_Gaff_ ], the federal claim does not have substance sufficient to confer subject matter jurisdiction [over a supplemental state claim] in federal court.").

[26] The presumption that a 12(b)(6) dismissal of the touchstone claims precludes the exercise of supplemental jurisdiction over any remaining claims can be overcome in "unusual circumstances." _Gaff_, 814 F.2d at 318. The Second Circuit has suggested that these "unusual circumstances" must include "some prejudice arising from relegating the case for

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

trial in the state court." _Nolan v. Meyer, 520 F.2d 1276, 1280 (2d Cir.1975)._ _See Purgess v. Sharrock, 33 F.3d 134, 139_ (12(b)(6) dismissal on the eve of trial allows supplemental jurisdiction over pendent claims because "[t]he parties and the court had spent years preparing").

We are convinced that no "unusual circumstances" were present in this case, and that the district court's decision to resolve the plaintiff's state law claims was an abuse of its discretion under § 1367. First, the resolution of this entire action in the district court **\*1256** took less than six months--and obviously would have taken less time if the parties and court had addressed only the "federal common law" claims pled. Second, the court held no hearing, but conducted the proceeding purely on written motions. These same written materials could be submitted to a state judge for his decision, with only minimal rewriting. Third, neither party made any allegation that a minor delay, or state court resolution of the issue, would cause them any special problem.

Fourth, the preemption defense to the state claims and the "federal common law" claims are conceptually distinct, and resolution of one issue does not affect resolution of the other. Fifth, this is not a case where the federal court had exclusive jurisdiction over the federal claim. Musson could have brought its original action in state court, which, frankly, would have been a far more appropriate forum.

Sixth, the preemption issue is not so clear as to render the state law claims "patently frivolous." _Wright, 29 F.3d at 1251._ The Supreme Court's recent opinion in _American Airlines_ does hold that some state law fraud claims are preempted, but it also holds that a party can recover "for the airline's alleged breach of its own, self-imposed undertakings." _513 U.S. at ----, 115 S.Ct. at 824._ Since the plaintiffs never informed the court of the particular state law theory on which they seek to recover, it is unclear if the ADA preempts the "state law claims." The entire record and collection of briefs before us does not cite a single state law case or statute. In fact, we do not even, at this point, know _which_ law in _which_ state Musson thinks Federal Express violated.

Seventh, although we have held above that the district court could not dismiss Musson's claim as insubstantial under 12(b)(1), Musson's claim is _close_

to insubstantial. In fact, the district court seems to have believed it to be, as the court's dismissal for lack of subject matter jurisdiction suggests. As we noted above, when a federal claim is dismissed as insubstantial, the Constitution absolutely forbids a district court from exercising supplemental jurisdiction over any remaining state claim.

Eighth, a state action was already pending in Shelby County, Tennessee. We find this fact extremely compelling. On the one hand, it is evidence of the ease with which these matters could have been relinquished to the control of the Tennessee state court. On the other hand, the existence of a contemporaneous state action suggests the appropriateness of discretionary judicial abstention to avoid interfering in a state court proceeding. We certainly do not believe that the present case meets the rigorous test for _Colorado River_ abstention. _See Arizona v. San Carlos Apache Tribe of Arizona, 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983); Moses H. Cone Memorial Hosp. v. Mercury Constr. Co., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)._ However, the insult to comity is greater when a federal court decides state claims that are already on a state court's docket. [FN4]

> FN4. The record does not indicate if the state court proceedings have been stayed pending resolution of Musson's federal case.

Ninth, we must return to the simple fact that the state law claims were never actually pled. The most that we could do now would be to remand the case so that the parties and court could comply with the minimal requirements of federal notice pleading. Once the state claims are properly before it, the district court would have to make another decision about whether supplemental jurisdiction was proper, weighing the relative advantage of resolution in federal and state court. At this point, the federal claims would have been dismissed for several months. Furthermore, the district court's initial resolution of the preemption issue, decided before the Court's decision in _American Airlines_ and without any idea as to the particular state law on which Musson based its claim, would likely have to be re-examined in light of new information. Given the ability of a state court judge to read a record, we cannot imagine that the district court could conclude that its own familiarity with this complicated, but not **\*1257**_that_ complicated, case

89 F.3d 1244                                                                                              Page 13
89 F.3d 1244, 1996 Fed.App. 0224P
**(Cite as: 89 F.3d 1244)**

constitutes "unusual circumstances" and justifies federal resolution of Musson's state law claims.

The only factor that suggests "unusual circumstances" in this case is the fact that the preemption issue is a question of federal law. The Court in *Gibbs* held that this was a relevant consideration, even while recognizing that a preemption defense does not create general federal jurisdiction. <u>383 U.S. at 726, 86 S.Ct. at 1139</u> ("[A]rgument for exercise of pendent jurisdiction is particularly strong" in "situations in which the state claim is so closely tied to questions of federal policy...."). Given the general respect for a state court's ability to decide federal issues, this consideration is clearly outweighed by the other factors at work in this case.

### VII

For the reasons described above, the district court's dismissal of Musson's federal claims is AFFIRMED, and the district court's resolution of Musson's state law claims is VACATED. The case is REMANDED and the district court instructed to dismiss Musson's state claims, to the extent that they are before the court, without prejudice.

89 F.3d 1244, 1996 Fed.App. 0224P

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT C



United States Court of Appeals, Seventh Circuit.
CENTRAL NAT. BANK IN CHICAGO
v.
CONTINENTAL CASUALTY CO.
No. 9978.

May 26, 1950.

Action by the Central National Bank in Chicago against the Continental Casualty Company on a 'bankers blanket bond' for alleged misappropriation of funds by its employee. At the time of issuance of the bond and the alleged losses defendant was an Indiana corporation. After plaintiff gave notice of the losses and filed proof of claim thereon, defendant effected a merger with an Illinois corporation. The united States District Court for the Northern District of Illinois, Eastern Division, Philip L. Sullivan, Jr., entered an order dismissing the complaint, and plaintiff appealed. The Court of Appeals, Swaim, Circuit Judge, held that at the time of the merger plaintiff had a 'claim existing' within the Indiana statute providing that a claim existing against a merged insurance corporation may be prosecuted to judgment as if the merger had not taken place, that the defendant corporation continued to exist after the merger for the purpose of prosecution of plaintiff's claim and that the federal district court in Illinois had jurisdiction of the action.

Judgment reversed and cause remanded.

West Headnotes

[1] Statutes ⚷ 206
361k206Most Cited Cases
In construing a statute, rules of construction require the Court of Appeals to give meaning to all of the words where possible.

[2] Federal Courts ⚷ 77.5
170Bk77.5Most Cited Cases

(Formerly 170Bk77, 106k274(12))

[2] Insurance ⚷ 1159
217k1159Most Cited Cases
(Formerly 217k72.3, 217k47)
Where Indiana insurance company issued banker's bond covering employees of Illinois bank and thereafter effected a merger with an Illinois insurance company pursuant to Indiana statute governing such merger, and bank gave notice of losses covered by bond and filed proof of claim thereon with Indiana company prior to merger, it had a "claim existing" within Indiana statute providing that any claim existing against merged insurance companies may be prosecuted to judgment as if such merger had not taken place, the Indiana company continued to exist after the merger for purpose of prosecution of such claim and the federal district court in Illinois had jurisdiction of the action. Burns' Ann.St.Ind. § 39-3912(b, e).
*407 Abraham W. Brussell, Milton I. Shadur, Chicago, Ill., Goldberg, Devoe & Brussell, Chicago, Ill., of counsel, for appellant.

Oscar M. Wolff, Thomas E. Kearne, Allan I. Wolff, Jr., Paul J. Furlong, Chicago, Ill., Wolff, Keane & Gomberg, Chicago, Ill., of counsel, for appellee.

Before KERNER, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This action was brought by Central National Bank in Chicago, having its place of business in Chicago, Illinois, against Continental Casualty Company, an Indiana corporation to recover on a 'Banker's Blanket Bond' for certain losses alleged to have been suffered by reason of the fraudulent misappropriation of funds by one of the bank's employees. This appeal is prosecuted from an order of the District Court dismissing the complaint as amended, on motion of the defendant, on the ground that at the time plaintiff's action was instituted the defendant corporation had ceased to exist by reason of having merged with the Continental Casualty Company, an

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

182 F.2d 407
182 F.2d 407
(Cite as: 182 F.2d 407)

Page 2

Illinois corporation.

This appeal presents two issues: Whether the Indiana corporation was in existence for the purpose of this suit on December 29, 1948, after it had been merged into the Illinois corporation. (2) Whether under the pleadings in this case the trial court or this court has any jurisdiction over the Illinois corporation. If the first of these issues is decided in favor of the plaintiff, the second issue becomes moot.

The complaint, filed December 29, 1948, alleged federal jurisdiction on the ground of diversity of citizenship in a controversy *408 involving more than $3,000. The suit was on a bond issued by the defendant on June 30, 1941. On January 20, 1949, plaintiff amended its complaint to allege that the action arose upon a bond required of national banking associations under the laws of the United States; thereby asserting an additional reason for federal jurisdiction. On January 28, 1949, the defendant entered a special appearance alleging that its corporate existence had ended on June 30, 1948, by reason of its being merged into the Continental Casualty Company, an Illinois corporation, and on that ground moved to dismiss the cause. March 11, 1949, the plaintiff filed a second amendment to the complaint increasing the demand for damages to $200,000 and on April 20, 1949, the present counsel for plaintiff were substituted for the original counsel.

A month later both parties were before the court, and at that time the District Judge indicated he was ready to decide the motion to dismiss and was under the impression that plaintiff's cause of action, if any, was against the Illinois corporation. Counsel for plaintiff thereupon asked for a continuance for time to review the pleadings, and possibly to file a further amendment to the complaint. On June 1, 1949, plaintiff filed a third amendment to the complaint in which Continental Casualty Company of Illinois was named as an alternative defendant and judgment was asked against the original defendant 'or in the alternative against the alternative defendant, Continental Casualty Company, an Illinois corporation.' On the motion of counsel for the defendant, the court struck the third amendment and then entered an order dismissing the cause.

In its original complaint the plaintiff alleged that after it had sustained the alleged losses between January 1, 1947, and December 12, 1947, it promptly gave notice to the defendant insurance company of such losses sustained, filed an itemized proof of claim with the insurance company, as required by the bond, and fully complied with all other requirements of the bond.

The merger of the two insurance companies was effected pursuant to and under the provisions of the Indiana statutes providing for such mergers. Specific provision is made in the Indiana Insurance Code as to the effect which shall be given to the merger or consolidation of insurance companies. Section 39-3912, Burns Ind. Stat. Ann. (1940 Repl.). Paragraph (e) of that section provides as follows: ' * * * and any claim existing or action or proceeding pending by or against any of such corporations may be prosecuted to judgment as if such merger or consolidation had not taken place, or such single corporation may be substituted in its place.'

The same provision was included in the Articles of Merger between the Indiana and Illinois corporations.

It is upon this provision of the Indiana statute and of the Articles of Merger that the plaintiff herein relies. The Bank contends its claim for losses sustained prior to the merger of the Indiana corporation with the Illinois corporation, on which losses the Bank gave notice and filed proof of claim prior to the merger, constituted a 'claim existing' within the meaning of the above quoted paragraph of the Indiana statute.

The defendant, on the other hand, contends that under Sec. 39-3912(b) of the Indiana statute the separate existence of the Indiana corporation ceased and that under a correct interpretation of the Indiana Insurance Code the plaintiff did not have a 'claim existing' unless at the date of the merger it had filed an instrument in some form of pending legal proceedings.

[1] With this contention of the defendant we ca-not agree. Paragraph (b) of Sec. 39-3912, providing that the merged corporation ceased to exist, was admittedly modified to some extent by paragraph (c) of the same Section. If the plaintiff had instituted an action against the Indiana corporation, to recover its alleged losses, prior to the merger of the two corporations, it could have prosecuted such action to judgment. Paragraph (e) of the Section admittedly modified paragraph (b), at least to that extent. But, in addition to providing that a pending or existing action

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

or proceeding might be prosecuted to judgment, paragraph (e) provided as a further*409 modification of paragraph (b) that a 'claim existing' might also be prosecuted to judgment against the merged corporation. If the words 'claim existing' only included a claim on which 'an instrument had been filed in some form of legal proceedings pending at the date of the merger', as contended by defendant, the words 'claim existing' would add nothing to the meaning of the paragraph and would amount only to surplusage. Rules of construction require us to give meaning to all of the words where possible.

[2] The word 'claim' has been defined by the courts of Indiana as used in the Probate Code of that state as a 'debt or demand of a pecuniary nature which could have been enforced against the decedent in his lifetime and could have been reduced to a simple money judgment.' Williams v. Williams, Adm'r, 217Ind. 581, 584, 29 N.E.2d 557;Tinkham v. Tinkham, 112 Ind.App. 532, 538, 45 N.e.2d 357, 360. We find the word similarly defined in 21 Am.Jur. . 579, Sec. 348. We find many other Indiana statutes also using the word 'claim' with the same normal meaning as used in the Probate Statutes. See Sec. 3-2608 Burns Ind. Stat. Ann. (1946 Repl.); Sec. 4-1501 Burns Ind. Stat. Ann. (1946 Repl.); Sec. 10-2113 Burns Ind. Stat. Ann. (1942 Repl.); Sec. 25-234 Burns Ind. Stat. Ann. (1948 Repl.); Sec. 48-1301 Burns Ind. Stat. Ann.; and Sec. 52-1124 Burns Ind. Stat. Ann. (1947 Repl.).

In the statute here under consideration it is significant also that the word 'existing' was used in connection with the word 'claim'. 'Existing' has an ordinary meaning of 'the fact, or state, of being or living.' In the instant case the plaintiff had alleged that it had sustained losses covered by the bond. It had given notice of the losses and filed proof of claim thereon prior to the merger. We must, therefore, hold that at the time of the merger plaintiff had a 'claim existing' within the meaning of the Indiana btatute and that the defendant Indiana corporation after its merger with the Illinois corporation continued to exist for the purpose of prosecuting plaintiff's claim to judgment as if such merger had not taken place.

The judgment of the District Court is, therefore, reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

182 F.2d 407

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT D



Page 1

W.S.A. **611.223**

 West's Wisconsin Statutes Annotated <u>Currentness</u>
Insurance (Ch. 600 to 655)

 Chapter 611. Domestic Stock and Mutual Insurance Corporations <u>(Refs & Annos)</u>

 Subchapter II. Organization of Corporations <u>(Refs & Annos)</u>

➡ **611.223**. Transfer of an insurer's place of domicile

**(1) Foreign insurer becomes a domestic insurer.** (a) A foreign insurer which desires to become a domestic insurer may submit to the commissioner an application for a certificate of incorporation and a certificate of authority. The application shall comply with par. (b) and shall include or have attached any other relevant documents or information that the commissioner reasonably requires. Upon review of the application, the commissioner may issue a certificate of incorporation and certificate of authority if the commissioner determines that all of the following are satisfied:

1. The applicant is in compliance with the provisions of chs. 600 to 655 that apply to domestic insurers.

2. The directors and officers of the applicant are trustworthy and competent and collectively have the competence and experience to engage in the particular insurance business proposed.

3. The proposed business is consistent with the interests of insureds and the public.

(b) The commissioner shall by rule specify the required contents and form of an application submitted under par. (a). In determining the required contents, the commissioner shall consider the information and documents which will permit the commissioner to determine whether the requirements of par. (a)1. to 3. are satisfied.

(c) The commissioner may by order relax one or more of the requirements of this subsection for a foreign insurer which desires to become a domestic insurer if, after a hearing conducted in accordance with ch. 227, the commissioner determines that the requirements are unnecessary to protect policyholders and the public because of the developed status of the foreign insurer.

**(2) Domestic insurer becomes a foreign insurer.** Upon approval by the commissioner, a domestic insurer may transfer its place of domicile to any other state in which it is admitted. As a condition of approving the transfer of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

W.S.A. **611.223**

domicile, the commissioner may require a special deposit, reinsurance or other protective measures by the insurer. After or simultaneous with the transfer of domicile, the insurer may apply under ch. 618 for authority to do business in this state as a foreign insurer.

**(3) Effect on existing contracts.** The transfer of an insurer's place of domicile under sub. (1) or (2) does not affect the obligations of the insurer under its existing insurance contracts or any other existing contracts.

<<For credits, see Historical Note field.>>

HISTORICAL AND STATUTORY NOTES

1995 Main Volume

  Source:
    1987 Act 247, § 18.

1987 Act 247, § 49 provides:

"Effective dates. This act takes effect on the day [April 21, 1988] after publication, except as follows:

"(1) The treatment of section **611.223**(1)(a) and (c), (2) and (3) of the statutes takes effect on the first day [March 1, 1989] of the 11th month beginning after publication."

W. S. A. **611.223**, WI ST **611.223**

Current through 2007 Act 14, published 06/13/07

© 2007 Thomson/West

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT E**

Westlaw.

W.S.A. **181.1106**

C

West's Wisconsin Statutes Annotated  Currentness
  Corporations (Ch. 180 to 188)
    Chapter 181. Nonstock Corporations  (Refs & Annos)
      Subchapter XI. Merger; Conversion

→ **181.1106.** Effect of merger

When a merger takes effect all of the following occur:

**(1) Termination of separate existence.**  Every other business entity that is a party to the merger merges into the surviving business entity, and the separate existence of every business entity, except the surviving business entity, ceases.

**(1m) Debts and obligations.**  (a) If, under the laws applicable to a business entity that is a party to the merger, one or more of the owners thereof is liable for the debts and obligations of such business entity, such owner or owners shall continue to be liable for the debts and obligations of the business entity, but only for such debts and obligations accrued during the period or periods in which such laws are applicable to such owner or owners.

(b) If, under the laws applicable to the surviving business entity, one or more of the owners thereof is liable for the debts and obligations of such business entity, the owner or owners of a business entity that is party to the merger, other than the surviving business entity, who become subject to such laws shall be liable for the debts and obligations of the surviving business entity to the extent provided in such laws, but only for such debts and obligations accrued after the merger. The owner or owners of the surviving business entity prior to the merger shall continue to be liable for the debts and obligations of the surviving business entity to the extent provided in par. (a).

(c) This subsection does not affect liability under any taxation laws.

**(2) Title to property.**  The title to all real estate and other property owned by each business entity that is a party to the merger is vested in the surviving business entity without reversion or impairment subject to any conditions to which the property was subject before the merger.

**(3) Liabilities.**  The surviving business entity has all liabilities of each business entity that is a party to the merger.

**(4) Pending proceedings.**  A civil, criminal, administrative, or investigatory proceeding pending by or against any business entity that is a party to the merger may be continued as if the merger did not occur, or the surviving business entity may be substituted in the proceeding for the business entity whose existence ceased.

**(5) Articles of incorporation or other similar governing document.**  The articles of incorporation, articles of organization, certificate of limited partnership, or other similar governing document shall be amended to the extent provided in the plan of merger.

**(6) Ownership interests.**  The shares or other interests of each business entity that is party to the merger that are to be converted into shares, interests, obligations, or other securities of the surviving business entity or any other business entity or into cash or other property are converted, and the former holders of the shares or interests are

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

W.S.A. **181.1106**

entitled only to the rights provided in the articles of merger or under laws applicable to each business entity that is party to the merger.

<<For credits, see Historical Note field.>>

HISTORICAL AND STATUTORY NOTES

2007 Electronic Update

Source:
2005 Act 476, § 44, eff. June 14, 2006.

2005 Legislation:

2005 Act 476 amended subsec. (2).

2002 Main Volume

Source:
1997 Act 79, § 48, eff. Jan. 1, 1999.
2001 Act 44, §§ 121 to 127, eff. Oct. 1, 2002.
2001 Act 105, § 55, eff. May 25, 2002.

**Prior Laws:**
L.1953, c. 554.
St.1953, § 181.47.
L.1973, c. 128, § 18, eff. Nov. 30, 1973.
St.1995, § 181.47.

2001 Act 105 amended subsec. (2).

2001 Act 44 amended subsec. (1); created subsec. (1m); amended subsec. (2); repealed and recreated subsec. (3); amended subsec. (4); repealed and recreated subsec. (5); and created subsec. (6).

W. S. A. **181.1106**, WI ST **181.1106**

Current through 2007 Act 19, published 8/22/2007

© 2007 Thomson/West

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**EXHIBIT F**



302 F.3d 707
302 F.3d 707
**(Cite as: 302 F.3d 707)**

**H**United States Court of Appeals,
Seventh Circuit.
HYATT INTERNATIONAL CORP., et al.,
Plaintiffs-Appellants,
v.
Gerardo COCO, et al., Defendants-Appellees.
**No. 01-1709.**

Argued Nov. 26, 2001.
Decided Sept. 3, 2002.

Hotel chain brought declaratory judgment action against Italian real estate agent over planned hotel in Milan. The United States District Court for the Northern District of Illinois, Paul E. Plunkett, J., dismissed action. Hotel chain appealed. The Court of Appeals, Diane P. Wood, Circuit Judge, held that: (1) dismissal of action for lack of Article III controversy was premature; (2) district court had specific personal jurisdiction over broker; (3) dismissal of action on basis of forum non conveniens was premature.

Reversed and remanded.

West Headnotes

**[1] Declaratory Judgment** 🔑 361.1
118Ak361.1Most Cited Cases
Dismissal, for lack of Article III controversy, of action brought by declaratory judgment plaintiff, was premature, since district court did not resolve issue of whether a declaration of rights was bona fide necessity for declaratory judgment plaintiff, as natural defendant, to carry on with its business, and whether declaratory judgment defendant's threats to sue, as natural plaintiff, had reached such a concrete point that declaratory judgment plaintiff legitimately needed declaration of its rights and other legal relations in order to go forward with its hotel project. U.S.C.A. Const. Art. 3, § 2, cl. 1; 28 U.S.C.A. § 2201.

**[2] Declaratory Judgment** 🔑 46
118Ak46Most Cited Cases

A declaratory judgment plaintiff must be able to show that the feared lawsuit from the other party is immediate and real, rather than merely speculative. 28 U.S.C.A. § 2201.

**[3] Declaratory Judgment** 🔑 46
118Ak46Most Cited Cases
The threat of suit, however immediate, is not by itself sufficient for the invocation of the federal power to issue a declaratory judgment; the Declaratory Judgment Act is not a tactical device whereby a party who would be a defendant in a coercive action may choose to be a plaintiff by winning the proverbial race to the courthouse. 28 U.S.C.A. § 2201.

**[4] Declaratory Judgment** 🔑 274.1
118Ak274.1Most Cited Cases
When considering whether federal power can be invoked to issue a declaratory judgment, later events cannot control the propriety of a district court's jurisdiction; only the actions of the declaratory defendant known to the declaratory plaintiff at the time the action is commenced can be considered in determining whether such a threat exists. 28 U.S.C.A. § 2201.

**[5] Federal Courts** 🔑 776
170Bk776Most Cited Cases
The Court of Appeals reviews a dismissal for lack of personal jurisdiction de novo.

**[6] Federal Courts** 🔑 797
170Bk797Most Cited Cases
Normally, on review of a motion to dismiss, the Court of Appeals accepts all well pleaded allegations in the complaint as true.

**[7] Federal Courts** 🔑 96
170Bk96Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

302 F.3d 707                                                                                    Page 2
302 F.3d 707
**(Cite as: 302 F.3d 707)**

**[7] Federal Courts** 97
170Bk97Most Cited Cases
If personal jurisdiction is challenged, a court must
decide whether any material facts are in dispute, if so,
it must hold an evidentiary hearing to resolve them,
at which point the party asserting personal
jurisdiction must prove what it alleged; until such a
hearing takes place, the party asserting personal
jurisdiction need only make out a prima facie case of
personal jurisdiction. Fed.Rules Civ.Proc.Rule
12(b)(2), 28 U.S.C.A.

**[8] Federal Courts** 86
170Bk86Most Cited Cases
District court had specific personal jurisdiction over
Italian real estate broker, as declaratory judgment
defendant and natural plaintiff, to lawsuit brought by
hotel, as declaratory judgment plaintiff and natural
defendant; there were continuous series of contacts
between broker and hotel, all related to Milan
property and future hotel, relevant set of dealings
between hotel and broker encompassed parties' entire
course of conduct with respect to Milan hotel, and
hotel's interest, elicited by broker and upon which he
sought a fee, was development of property in
downtown Milan. Ill.S.H.A. Const. Art. 1, § 2;
S.H.A. 735 ILCS 5/2-209.

**[9] Federal Courts** 417
170Bk417Most Cited Cases
A federal court sitting in diversity must rely on the
law of personal jurisdiction that governs the courts of
general jurisdiction in the state where the court is
sitting.

**[10] Process** 64
313k64Most Cited Cases

**[10] Process** 83
313k83Most Cited Cases
Illinois authorizes service of process both on in-state
defendants and out-of-state or foreign defendants.
S.H.A. 735 ILCS 5/2-209.

**[11] Federal Courts** 76.5
170Bk76.5Most Cited Cases
General jurisdiction is proper only when the
defendant has continuous and systematic contacts
with the state in question; if such contacts exist, the
court may exercise personal jurisdiction over the
defendant even in cases that do not arise out of, and
are not related to, the defendant's forum contacts.

**[12] Federal Courts** 76.10
170Bk76.10Most Cited Cases
Specific jurisdiction is a limited assertion of state
power, in which personal jurisdiction exists for
controversies that arise out of or are related to the
defendant's forum contacts.

**[13] Courts** 12(2.1)
106k12(2.1)Most Cited Cases
The Illinois long arm statute permits its courts to
exercise jurisdiction on any basis permitted by the
Illinois and United States Constitutions. S.H.A. 735
ILCS 5/2-209.

**[14] Constitutional Law** 3964
92k3964Most Cited Cases
    (Formerly 92k305(5))
The federal test for assertions of personal jurisdiction
requires that the defendant must have minimum
contacts with the forum state such that the
maintenance of the suit does not offend traditional
notions of fair play and substantial justice; those
contacts may not be fortuitous, instead, the defendant
must have purposefully established minimum
contacts within the forum state before personal
jurisdiction will be found to be reasonable and fair.

**[15] Federal Courts** 76.15
170Bk76.15Most Cited Cases
Crucial to a personal jurisdiction minimum contacts
analysis is a showing that
the defendant should reasonably anticipate being
haled into court in the forum state, because the
defendant has purposefully availed itself of the
privilege of conducting activities there; while an out
of state party's contract with an in state party is not
enough alone to establish the requisite minimum

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

302 F.3d 707
302 F.3d 707
(Cite as: 302 F.3d 707)

contacts, prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing may indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant.

**[16] Federal Courts** 76.10
170Bk76.10Most Cited Cases

Where a defendant's contacts with a forum state are limited, such that specific jurisdiction is the only option for asserting personal jurisdiction over a person, the suit must arise out of or be related to its minimum contacts with the forum state; this nexus is important, because it aims to give a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

**[17] Federal Courts** 45
170Bk45Most Cited Cases

Under the forum non conveniens doctrine, a court may dismiss a case if an alternative forum is available and if dismissal would serve the interests of justice, even if the case is properly before it from the technical standpoint of subject matter and personal jurisdiction.

**[18] Federal Courts** 45
170Bk45Most Cited Cases

**[18] Federal Courts** 101
170Bk101Most Cited Cases

The forum non conveniens doctrine has been largely replaced by the transfer of venue statute with respect to cases wholly within the system of federal courts; however, it remains available as a ground for dismissal when a foreign court provides a more convenient forum. 28 U.S.C.A. § 1404(a).

**[19] Federal Courts** 45
170Bk45Most Cited Cases

Dismissal of action over brokerage fee that was brought by hotel, as declaratory judgment plaintiff and natural defendant, against real estate broker, as

declaratory judgment defendant and natural plaintiff, on basis of forum non conveniens, was premature; even though broker's lawsuit in Italy seemed to provide acceptable alternative, district court did not conduct balancing of public and private interests.

**[20] Federal Courts** 45
170Bk45Most Cited Cases

A forum non conveniens analysis takes place in two steps; first, the court must determine whether an adequate alternative forum is available, and, second, it must weigh several private and public interest factors related to the proper location for the litigation.

**[21] Federal Courts** 45
170Bk45Most Cited Cases

The first inquiry in a forum non conveniens analysis requires a finding that all the parties are within the jurisdiction of the alternative forum and are amenable to process there.

**[22] Federal Courts** 45
170Bk45Most Cited Cases

When a plaintiff chooses her own forum, it is normally reasonable to assume that the choice is convenient, for purposes of forum non conveniens analysis.

**[23] Federal Courts** 45
170Bk45Most Cited Cases

In normal instances, a certain deference is due to the plaintiff's choice of forum with respect to convenience, for purposes of forum non conveniens analysis; in the case of a declaratory judgment action, however, that principle has less force.

*709 Mark P. Miller (argued), Wildman, Harrold, Allen & Dixon, Chicago, IL, for Plaintiffs-Appellants.

Jonathan G. Bunge (argued), Chicago, IL, for Defendants-Appellees.

Before ROVNER, DIANE P. WOOD, and WILLIAMS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

302 F.3d 707
302 F.3d 707
(Cite as: 302 F.3d 707)

It has become commonplace to observe that the world is getting smaller and that boundary lines between one country and the next have become blurred, if not nonexistent. Yet those boundary lines still *710 exist, and one of their more important functions is to allocate litigation among the several national court systems. This can be tricky, if a business relationship that has flowed seamlessly from one country to another goes sour. We have just such a case. Gerardo Coco, an Italian businessman who had dealings with Hyatt International Corporation. (Hyatt) in Chicago concerning a property in Italy, is fighting Hyatt's effort now to hale him into the U.S. courts to resolve some disputes that have arisen. His challenge to that attempt prevailed in the district court, but we conclude that the case should not have been dismissed for lack of personal jurisdiction, and we therefore remand for further proceedings.

## I

Coco is a director and employee of A.T.E. Holdings, Limited, and of A.T.E. Italia, S.r.l. (collectively A.T.E.). A.T.E. Holdings, Limited, is a business organized under the laws of England with its principal place of business in London; A.T.E. Italia, S.r.l., is a business organized under the laws of Italy, with its principal place of business in Milan.

Through the A.T.E. entities, Coco enters into ventures for the development of real estate in the hospitality industry. He provides a full range of services as a developer, investor, broker, or even contractor for hotel properties. It was in these capacities that he was approached in 1999 by the English entity Newpenny, Limited (Newpenny), which had an option to purchase a real estate parcel suitable for a hotel in downtown Milan. Newpenny asked Coco to facilitate its development of the parcel by finding investors willing to commit resources to the project. Thinking he might find an interested party in Hyatt, Coco sent a fax to Michael Evanoff, Hyatt's Vice President of Development, at Hyatt's Chicago headquarters. Evanoff, apparently intrigued by the opportunity, responded positively, and later he met with Coco to discuss the incipient project over dinner in London. At that time, Coco unequivocally stated that he was acting merely as an agent of Newpenny, and accordingly was not seeking a commission or broker's fee from Hyatt. Evanoff confirmed Hyatt's interest in a possible deal.

Flurries of faxes and phone calls between Milan and Chicago followed, and Coco even visited Evanoff at Hyatt's Chicago headquarters on one occasion in connection with the proposed deal. The parties' initial discussions contemplated an agreement whereby Hyatt would own 50% of the equity in the project, and Coco and Newpenny would own 20%. But despite these promising efforts, that agreement fell apart, and on July 7, 1999, Hyatt went ahead solo in the development of what will soon open as the Park Hyatt Milan. At that point, Coco re-entered the picture and claimed that Hyatt owed him a broker's fee for the work that he performed that ultimately led to Hyatt's project. Hyatt took the opposite position, claiming that Coco had expressly disclaimed any right to such a fee.

Coco responded with two arguments. First, he referred to a supposed promise that Hyatt made to him during one of the final meetings in Milan, when Hyatt expressed its desire to undertake the development without any assistance. This promise, he claimed, was backed by a later recommendation that he be provided a "$1,000 per key finders' fee," as is supposedly customary, at least overseas. He further argued that Hyatt could not have finalized this deal but for Coco's involvement, and he was accordingly entitled to some remuneration for his efforts. He attempted to reconcile this position with his earlier disclaimer of any right to a fee by asserting that the no-fee arrangement was effective only so long as there was *711 some understanding between the parties that a partnership would ultimately be formed; once Hyatt took off on its own, he said, his status was transformed into that of a *de facto* broker.

More correspondence flowed between Chicago and Milan, and Coco threatened to sue Hyatt in Milan for the fee he was owed. After a few such threats, Hyatt filed an action under 28 U.S.C. § 2201 in the Northern District of Illinois seeking a declaratory judgment that it had no obligation to pay Coco and his entities any fee or commission in connection with the hotel development. Shortly thereafter, Coco filed the threatened suit in the Civil Court of Milan seeking payment for his services.

While pursuing the currently pending Italian litigation, Coco and A.T.E. moved to dismiss the Illinois litigation on three grounds: lack of personal jurisdiction, *forum non conveniens,* and the impropriety of a declaratory judgment in this matter. The district court agreed with the defendants on the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

first point, finding that even though Coco had sufficient contacts with Illinois throughout the "partnership" part of the deal, the transaction out of which he was asking for the fee was a separate event that took place entirely outside of Illinois. Pursuant to the "transaction of business" provision of the Illinois long-arm statute, the district court dismissed the action for lack of personal jurisdiction.

## II

A. Impropriety of Declaratory Judgment

[1] Because Coco's argument concerning the propriety of Hyatt's effort to obtain a declaratory judgment potentially implicates the district court's jurisdiction, we choose to address it first (recognizing that the option is ours, under *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 578, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999)). The question, in short, is whether Hyatt is impermissibly seeking an advisory opinion about its obligation to pay fees to Coco. If it is, then we would have to dismiss the suit for lack of a proper Article III case or controversy. If not, or at a minimum if the record requires further development on this point, dismissal on that ground would be premature.

Declaratory judgment actions serve an important role in our legal system insofar as they permit prompt settlement of actual controversies and establish the legal rights and obligations that will govern the parties' relationship in the future. See Edwin Borchard, *Declaratory Judgments* 107 (1934). On the other hand, there is no doubt that the declaratory judgment mechanism can be abused. As we commented in *Hoover v. Wagner,* 47 F.3d 845 (7th Cir.1995), "[d]eclaratory relief is discretionary in a strong sense, but that is probably because it is often used to seize the forum from the natural plaintiff." *Id. at 850* (citations and emphasis omitted). In this case, the natural plaintiff is Coco: it is he who claims a right to a fee from Hyatt, and Hyatt that claims it has no such obligation. Furthermore, Hyatt's action does not fit particularly well within the usual declaratory judgment pattern, under which the "natural" defendant wants to proceed with a business opportunity-- *e.g.,* the production of widgets--but it is impeded because of a lack of clarity as to its legal rights, fearing something like a possible patent infringement suit. See 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2751, pp. 455-56 (3d ed.1998). It is hard to see what harm Hyatt would

have suffered by waiting for Coco to sue, other than the normal uncertainty a defendant experiences while the statute of limitations is running and there is a possibility of a later obligation to pay money damages. Early resolution of a threat of litigation, in a friendly forum, is no doubt of **\*712** value to a potential defendant, but the statute requires an "actual" controversy. That is easily seen in the patent example cited above, because the natural defendant is prevented from engaging in some extra-judicial conduct (that the law does not aim to discourage) as long as its patent rights are unclear.

[2] Indeed, it is not just § 2201 that requires an "actual" controversy. As we have already noted, a declaratory action, like any other action, must satisfy Article III, which allows federal courts to act only in the event of actual "cases and controversies." See *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). The declaratory judgment plaintiff must be able to show that the feared lawsuit from the other party is immediate and real, rather than merely speculative. *Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 506-07, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Norfolk Southern Ry. Co. v. Guthrie,* 233 F.3d 532, 534- 35 (7th Cir.2000). Hyatt's evidence on these points was thin, at least until Coco proved its prediction right by filing his Italian action. Until it sued Coco in the Northern District of Illinois, it was possible that Coco's repeated threats to sue Hyatt in Italy were no different from those of many other disgruntled co-venturers. If anything, Coco's delay in instituting his threatened suit suggests that the prospect of litigation was unclear. On the other hand, because the district court did not reach this question, we may not have all the relevant facts. We do not know, for example, whether under Italian law a broker has any kind of lien on the property or other powers to disrupt the business of Hyatt's new hotel in Milan. If that were the case, then Hyatt's action bears a closer resemblance to other declaratory judgment suits in which the declaration of rights is a *bona fide* necessity for the natural defendant/declaratory judgment plaintiff to carry on with its business.

[3] Furthermore, the record may show that Coco's threats to sue had reached such a concrete point that Hyatt legitimately needed a declaration of its "rights and other legal relations" in order to go forward with the project in question. If there was a potential oral agreement between itself and Coco, the scope and

terms of any such agreement could have an immediate effect on Hyatt. Of course the threat of suit, however immediate, is not by itself sufficient for the invocation of the federal power to issue a declaratory judgment: as other courts have noted, the Declaratory Judgment Act "is not a tactical device whereby a party who would be a defendant in a coercive action may choose to be a plaintiff by winning the proverbial race to the courthouse." *Terra Nova Ins., Co., Ltd. v. Acer Latin Am., Inc.,* 931 F.Supp. 852, 854-55 (S.D.Fla.1996).

[4] The existence of these questions is enough for present purposes to allow us to conclude that dismissal at this time for lack of an Article III controversy would be premature. If Coco had not sued, it would have been appropriate on remand to look into this question further. At this point, however, the matter has become somewhat academic, even though it remains true that later events cannot control the propriety of the district court's jurisdiction: "[o]nly the actions of the declaratory defendant known to the declaratory plaintiff at the time the action is commenced can be considered in determining whether such a threat exists." *Norfolk Southern Ry. Co.,* 233 F.3d at 534-35. See also *Trippe Mfg. Co. v. American Power Conversion Corp.,* 46 F.3d 624, 627 (7th Cir.1995). We leave the question of any further exploration of this subject to the discretion of the district court.

B. Personal Jurisdiction

[5][6][7][8] We review a dismissal for lack of personal jurisdiction de novo. *713Logan Prods., Inc. v. Optibase, Inc.,* 103 F.3d 49, 52 (7th Cir.1996). Normally, on review of a motion to dismiss, this court accepts all well-pleaded allegations in the complaint as true. *Tobin for Governor v. Illinois State Bd. of Elections,* 268 F.3d 517, 521 (7th Cir.2001). If personal jurisdiction is challenged under Rule 12(b)(2), the court must decide whether any material facts are in dispute. If so, it must hold an evidentiary hearing to resolve them, at which point the party asserting personal jurisdiction must prove what it alleged. Until such a hearing takes place, the party asserting personal jurisdiction need only make out a *prima facie* case of personal jurisdiction. *Id.* See also 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1351, pp. 226-27 (2d ed. Supp.2001).

[9] A federal court sitting in diversity must rely on

the law of personal jurisdiction that governs the courts of general jurisdiction in the state where the court is sitting. *Dehmlow v. Austin Fireworks,* 963 F.2d 941, 945 (7th Cir.1992). In this case, the law to which the district court correctly turned was that of Illinois. (Even though the case is governed by state law, the method of service, in contrast, will be governed by fed. R. Civ. P. 4; Rule 4(e)(1) in turn allows use of the methods authorized by the law of the state in which the district court is located, while other parts of Rule 4 provide federally sanctioned alternatives.). As we had occasion to observe in *United Rope Distribs., Inc. v. Seatriumph Marine Corp.,* 930 F.2d 532, 534-35 (7th Cir.1991), a federal court borrowing a state jurisdictional statute may acquire personal jurisdiction only to the extent that the state law authorizes service of process.

[10] Illinois, like virtually every other state, authorizes service of process both on in-state defendants and--pertinent to our case--out-of-state or "foreign" defendants (meaning both those from other U.S. states and those like Coco from foreign countries). See 735 ILCS 5/2-209. The question is whether any applicable limitations exist to make service on Coco and his two companies improper. Those limits might be found within the Illinois statute itself, or, if the Illinois statute goes beyond the scope authorized by the due process clause of the Fourteenth Amendment to the U.S. Constitution, those limits might be constitutional in nature. We look first to the state statute, and then to the Constitution.

The Supreme Court has adopted the labels first proposed in the academic literature that distinguish between "general" jurisdiction and "specific" jurisdiction. See *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414,415 nn. 8, 9, 104 S.Ct. 1868 (1984) (citing Arthur T. von Mehren and Donald T. Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 HARV. L. REV. 1121 (1966)); see also *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

[11][12] So-called general jurisdiction is proper only when the defendant has "continuous and systematic" contacts with the state in question; if such contacts exist, the court may exercise personal jurisdiction over the defendant even in cases that do not arise out of and are not related to the defendant's forum contacts. But as Hyatt has not asserted that Illinois can exercise general jurisdiction over the defendants,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

we consider only the propriety of specific jurisdiction, a more limited assertion of state power, in which personal jurisdiction exists for controversies that arise out of or are related to the defendant's forum contacts. See *Steel Warehouse of Wisconsin, Inc. v. Leach,* 154 F.3d 712, 714 (7th Cir.1998).

**\*714 1. Illinois's Long-Arm Statute**

Some long-arm statutes contain a list of permitted grounds of jurisdiction, into which a particular case must fit, while other long-arm statutes simply authorize the state courts to assert personal jurisdiction on any basis not forbidden by the due process clause of the Fourteenth Amendment. Until 1988, Illinois's statute was of the former type. In 1988, however, the law was amended to add a new subsection (c) which reads as follows: "A court may also exercise jurisdiction on any other basis [apart from those enumerated in subsections (a) and (b) ] now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2- 209(c); see *Central States, Southeast and Southwest Areas Pension Fund v.Reimer Express World Corp.,* 230 F.3d 934, 940 (7th Cir.2000). Hyatt argues that this addition in effect makes the enumerated grounds of jurisdiction superfluous, and leaves for us only the question whether the proposed assertion of jurisdiction would violate either the Illinois Constitution or the U.S. Constitution. Coco disagrees, claiming that the catch-all provision does not apply.

The district court agreed with Coco and eschewed reliance on the catch-all; instead, the court looked to § 2-209(a)(1), which authorizes jurisdiction based upon "[t]he transaction of any business within this State" to see if Coco could be reached that way. (Insofar as the enumerated sections are concerned, Hyatt does not claim that the court should have consulted a different part of the law.) Under this provision, the district court found that Coco's acts in Illinois were not sufficient to warrant the exercise of jurisdiction. It reached this conclusion by limiting its consideration of in-state contacts to those related to Coco's actions after the partnership deal fell apart. Only then, the court reasoned, did Coco's alleged brokerage arise. As Coco had no contacts with Illinois during that phase of his dealings with Hyatt, specific jurisdiction could not be established.

The question before us is whether the district court properly interpreted § 2- 209. If, as Coco and the

district court thought, the catch-all provision of the statute covers only situations not already addressed in the enumerated sections, or if the catch-all is not available when a more specific section appears to cover the conduct at issue, then we would need to consider whether the court correctly evaluated the "transaction of business" that occurred here. If, on the other hand, the catch-all applies whether or not an enumerated section also seems pertinent, we can move directly to the Illinois and federal constitutional analysis.

[13] While we appreciate the logic of the district court's conclusion, this court has already concluded that the Illinois long-arm statute now "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Central States,* 230 F.3d at 940. The language of § 2-209(c) precludes the narrower approach: it would make no sense to refer to exercising jurisdiction "also" on any "other" basis, if subsection (c) had no application when another section of the statute applied. Moreover, we have found no Illinois case interpreting § 2-209(c) to apply only to cases where none of the enumerated possibilities is met. (We recognize that this court in one instance reviewed an assertion of jurisdiction only under the enumerated clauses, and not under the catch-all, and concluded that jurisdiction was lacking. See *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,* 136 F.3d 537 (7th Cir.1998). But there is no hint in the opinion in *IDS Life* that anyone argued for jurisdiction based on § 2-209(c); furthermore, it seems quite unlikely \*715 that the court would have reached a different result even if someone had. In other cases that looked more specifically at the question, we have turned directly to the constitutional inquiries. See *Central States,* 230 F.3d at 940;*Janmark, Inc. v. Reidy,* 132 F.3d 1200, 1203 (7th Cir.1997).)

Our interpretation of Illinois law finds ample support in the decisions of the Illinois courts, which now apply the catch-all provision to establish jurisdiction even where jurisdiction could not be established through one of the enumerated clauses. See, *e.g., Zazove v. Pelikan, Inc.,* 326 Ill.App.3d 798, 260 Ill.Dec. 412, 761 N.E.2d 256, 261 n. 2 (2001) (rejecting contention that the specific provision must be met if applicable even where the catch-all establishes jurisdiction). In fact, the catch-all may not make any difference on the present facts. This case is remarkably similar to *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.,* 726 F.2d 1209, 1215-16 (7th

Cir.1984), in which we concluded that original discussions supported a finding of jurisdiction. We found unconvincing the separation of the transactions into two insulated jurisdictional entities, holding that "the contract under which the plaintiff is suing ... lies in the wake of Bates' commercial activities in Illinois." *Id.* at 1216.

2. Illinois Constitutional Limits

Turning now to the constitutional aspects of the inquiry, an important, initial qualification appears in *Rollins v. Ellwood*, 141 Ill.2d 244, 152 Ill.Dec. 384, 565 N.E.2d 1302 (1990). In *Rollins*, the Illinois Supreme Court drew a distinction between the due process rulings of the United States Supreme Court, which it recognized placed an outer limit on the state's ability to assert jurisdiction, and due process rulings under the Illinois Constitution. *Id.* at 1314. In order to give Illinois's long-arm statute "a definite meaning and scope that does not fluctuate with every new pronouncement on the limits of Federal due process," *id.,* the Illinois Supreme Court held that it would separately consider limitations that might exist under the due process clause of the Illinois Constitution. *Id.* at 1316. With that in mind, we proceed first to an evaluation of Illinois constitutional limits, and then to the federal due process clause.

Article 1, section 2 of the Illinois Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." The Illinois Supreme Court has construed this to require that jurisdiction may be "asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins,* 152 Ill.Dec. 384, 565 N.E.2d at 1316.

This court has previously suggested, however, that there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1276 (7th Cir.1997); *Klump v. Duffus,* 71 F.3d 1368, 1371 n.4 (7th Cir.1995). While we acknowledge the concern of the Illinois Supreme Court expressed in *Rollins* that these two standards hypothetically might diverge in some cases, we can find nothing in Illinois law that suggests that the due process limits in the kind of case now before us would be different at the state

level and the federal level. Rather than repeat ourselves, therefore, we note that in no case post-*Rollins* has an Illinois court found federal due process to allow the exercise of jurisdiction in a case where Illinois limits prohibited it, and conclude that in this particular instance it is enough to evaluate the limits that the Fourteenth *716 Amendment due process places on state exercises of personal jurisdiction.

3. Federal Constitutional Limits

[14][15] The federal test for assertions of personal jurisdiction has been settled for more than fifty years: it is the familiar one found in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), which requires that the defendant must have minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Id.* at 316, 66 S.Ct. 154 (citation omitted). Those contacts may not be fortuitous. Instead, the defendant must have "purposefully established minimum contacts within the forum State" before personal jurisdiction will be found to be reasonable and fair. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Crucial to the minimum contacts analysis is a showing that the defendant "should reasonably anticipate being haled into court [in the forum State]," *id.* at 474, 105 S.Ct. 2174 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)), because the defendant has "purposefully avail[ed] itself of the privilege of conducting activities" there. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). While an out-of-state party's contract with an in-state party is not enough alone to establish the requisite minimum contacts, *Burger King,* 471 U.S. at 478, 105 S.Ct. 2174, "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" may indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant. *Id.* at 479, 105 S.Ct. 2174.

[16] That much is true for all assertions of jurisdiction, general or specific. Where the defendant's contacts are more limited, such that specific jurisdiction is the only option, the suit must "arise out of" or "be related to" these minimum contacts with the forum state. This nexus is

important, particularly in its application to the case at bar, because it aims to give "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. 559.* Potential defendants should have some control over--and certainly should not be surprised by--the jurisdictional consequences of their actions. Thus, when conducting business with a forum in one context, potential defendants should not have to wonder whether some aggregation of other past and future contacts will render them liable to suit there.

This still leaves the obvious question, however, of how to distinguish between those contacts out of which a suit "arises" and those contacts that are not sufficiently connected to a suit to be considered. Here, we have two alternative scenarios: the first, Hyatt's, portrays a continuous series of contacts between Coco and itself, all related to the Milan property and the future hotel, during which the details of the parties' legal relationship may have shifted; the second, Coco's, portrays two distinct transactions, one related to a possible joint venture, and the other related to a brokerage arrangement. This court has already rejected "a hybrid between specific and general jurisdiction" to deal with cases where a transaction seemed insufficient for specific jurisdiction but somehow grew out of multiple, unconnected contacts. *RAR, 107 F.3d at 1277.* Either Coco's contacts were sufficient, or they **\*717** cannot be supplemented by prior unrelated acts. *RAR* went on to hold, relevantly to our inquiry:

Admittedly, RAR's suit is, in a certain sense, related to Turner's contacts with Illinois, if only because Turner never would have come to handle the engines in Scotland had it not previously dealt with RAR in Illinois. We do not think, however, that using such a loose causal connection between a suit and a defendant's forum contacts as the basis for personal jurisdiction comports with fair play and substantial justice.

*Id.* In *RAR* we agreed with the Third Circuit's position in *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co., 75 F.3d 147 (3d Cir.1996)* that it is only the "dealings between the parties in regard to the disputed contract" that are relevant to minimum contacts analysis. *Id. at 153.*

We agree with Hyatt that the relevant set of dealings between itself and Coco encompass the parties' entire

course of conduct with respect to the Milan hotel. But for Coco's initial efforts, he would have never come into the position of a broker at a point after the partnership faltered. The contacts from which Coco claims a fee directly arise out of his course of dealings with Hyatt. Hyatt's interest--elicited by Coco, and based on which he now seeks a fee--was all along in the development of a property in downtown Milan; it cannot now be dissected into two purportedly unrelated events, one in which Coco was a putative partner, and another in which he was a secondary figure.

Interestingly, Coco himself apparently has argued for a unitary reading of the events in the suit he filed with the Civil Court of Milan. In his Italian complaint, Coco asserts that the string of meetings and correspondence led to the interest of Hyatt in the property, and he avers specifically that "all the teleconferences between the parties, the visits, the on-site inspections to the real estate, the documents and, more specifically, the e-mail dated July 13th, 1999 prove that a contract of brokerage has been entered into pursuant to Art. 1326 of the Italian Civil Code." We are concerned at this indication that Coco may have asserted one set of facts in the U.S. courts to defeat this suit, and another set of facts in the Italian courts to win on essentially the same claim. To the extent he is merely pleading inconsistently, this is not a problem from the point of view of the U.S. courts. See *fed. R. Civ. P. 8(e)(2).* If Coco prevails in one case on the basis of a position inconsistent with one he takes later, judicial estoppel would potentially apply. See *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp., 910 F.2d 1540, 1548 (7th Cir.1990).* Furthermore, if the Italian proceedings terminate first, a question of recognition and enforcement of the foreign judgment will arise. Because we are upholding personal jurisdiction, we do not believe it necessary to explore this point further at this time.

### C. Forum Non Conveniens

[17][18][19] The third ground on which Coco moved to dismiss, which he presents on appeal as an alternate ground for affirmance, was the doctrine of *forum non conveniens.* Under that judge-made rule, a court may dismiss a case if an alternative forum is available and if dismissal would serve the interests of justice, even if the case is properly before it from the technical standpoint of subject matter and personal jurisdiction. *Kamel v. Hill-Rom Co., 108 F.3d 799,*

802 (7th Cir.1997). While, with respect to cases wholly within the system of U.S. federal courts, the doctrine has been largely replaced by the transfer of venue statute, 28 U.S.C. § 1404(a), it remains available as a ground for dismissal when a foreign court provides a more convenient forum. *718 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3914.12, p. 726 (2d ed.1992). See, *e.g., Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *In re Union Carbide Corp. Gas Plant Disaster*, 809 F.2d 195 (2d Cir.1987).

[20][21] A *forum non conveniens* analysis takes place in two steps. First, the court must determine whether an adequate alternative forum is available; second, it must weigh several private and public interest factors related to the proper location for the litigation. The first inquiry requires a finding that all the parties are within the jurisdiction of the alternative forum and are amenable to process there. Here, Italy is of course the proposed alternative forum, and it is clear that the Italian courts (specifically the courts of Milan) are available; indeed, Hyatt did not challenge jurisdiction in the parallel Italian proceeding. Furthermore, it appears that the Italian courts are quite capable of providing a remedy to either party. Mr. Delli Santi, a reputed member of the Italian bar, submitted an affidavit on the propriety of the Milan forum and the availability of the remedy and the defenses that are relevant to this case under Italian law-- precisely the kind of evidence needed to show the adequacy of a foreign forum. *Kamel*, 108 F.3d at 803. From this standpoint also, therefore, Italy seems to provide an acceptable alternative. (We note here that even if this declaratory action were to proceed in Illinois, under Illinois choice of law rules it is possible--perhaps even likely--that Italian law would apply.)

We move therefore to the second inquiry. The district court never conducted the balancing of public and private interests that is normally required in a *forum non conveniens* case. See, *e.g., Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Piper*, 454 U.S. at 257, 102 S.Ct. 252. This is an exercise far better suited to the district court. Although we recognize that we have the power to decide it nonetheless, see *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 527 (7th Cir.2001), particularly because the parties fully argued the issue both before the district court and here, we think that the wiser course is to allow the

district court to consider this issue in the first instance on remand.

[22][23] A note is in order, however, with respect to the "convenience of the parties" analysis. When a plaintiff chooses her own forum, it is normally reasonable to assume that the choice is convenient. *Piper*, 454 U.S. at 256, 102 S.Ct. 252. The plaintiff is, after all, master of the complaint, *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 880 (7th Cir.2001), and this includes the choice of where to bring suit. In normal instances, therefore, a certain deference is due to the plaintiff's choice of forum with respect to convenience. See, *e.g., ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 553 (7th Cir.2001). In the case of a declaratory judgment action, however, that principle has less force: but for Hyatt's preemptive filing in Illinois, this would be in all respects Coco's suit, and he would have been entitled to file whenever he wanted, wherever he wanted. He is the "natural plaintiff"--the one who wishes to present a grievance for resolution by a court. *Tempco Elec. Heater Corp. v. Omega Eng., Inc.*, 819 F.2d 746, 749-50 (7th Cir.1987). We have expressed wariness at the prospect of "a suit for declaratory judgment aimed solely at wresting the choice of forum from the 'natural plaintiff.' " *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir.1993). It is quite clear from Coco's arguments, and from his having filed suit in Italy, that Illinois is not his forum of preference. This is only one of many considerations the district court will *719 wish to take into account, and we do not mean by this observation to limit the court's discretion otherwise when it considers this point.

### III

For these reasons, we REVERSE the district court's judgment and REMAND for further proceedings in accordance with this opinion.

• HYATT INTERNATIONAL CORPORATION, et. al., Plaintiffs-Appellants, v. Gerardo COCO, et. al., Defendants-Appellees., 2001 WL 34105870 (Appellate Brief) (C.A.7 2001), Brief of Plaintiffs-Appellants

• HYATT INTERNATIONAL CORPORATION, et. al., Plaintiffs-Appellants, v. Gerardo COCO, et. al., Defendants-Appellees., 2001 WL 34105871 (Appellate Brief) (C.A.7 2001), Brief of Defendants - Appellees

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

302 F.3d 707
302 F.3d 707
**(Cite as: 302 F.3d 707)**

Page 11

•<u>HYATT INTERNATIONAL CORPORATION, et.</u>
<u>al., Plaintiffs-Appellants, v. Gerardo COCO, et. al.,</u>
<u>Defendants-Appellees.,    2001    WL    34105872</u>
(Appellate  Brief)  (C.A.7  2001),  Reply  Brief  of
Plaintiffs-Appellants

302 F.3d 707

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT G



843 F.Supp. 642
843 F.Supp. 642, 30 U.S.P.Q.2d 1546
**(Cite as: 843 F.Supp. 642)**

**C** United States District Court,
D. Oregon.
NSI CORPORATION, an Oregon corporation,
Plaintiff,
v.
SHOWCO, INC., a Texas corporation, Defendant.
**Civ. No. 93-1153-FR.**

Jan. 21, 1994.

Action was filed seeking declaratory judgment that use of mark did not infringe on registered trademark. On trademark holder's motion to dismiss or to transfer, the District Court, Frye, J., held that declaratory judgment action would be dismissed due to infringer's misuse of Declaratory Judgment Act to engage in forum shopping.

Motion granted.

West Headnotes



**[1] Federal Courts** 1143
170Bk1143Most Cited Cases
Doctrine of federal comity is discretionary doctrine which permits one federal district court to decline to exercise jurisdiction over matter if complaint has been filed in another federal district court.



**[2] Federal Courts** 1143
170Bk1143Most Cited Cases
In considering issues raised by doctrine of federal comity, courts are not bound by technicalities.



**[3] Declaratory Judgment** 362
118Ak362Most Cited Cases
Declaratory judgment action brought by alleged trademark infringer would be dismissed on ground that infringer misused Declaratory Judgment Act to engage in forum shopping, where infringer, one day prior to filing the action, sent settlement proposal to trademark holder and led holder to believe that settlement negotiations were in progress, holder's delay of one-month in responding to settlement proposal was consistent with usual course of communications between parties, and infringer admitted that it was fear of inconvenient forum, and not holder's delay in responding to settlement offer that prompted filing of action. 28 U.S.C.A. § 2201(a).
*643Alexander C. Johnson, Jr., Gerald D. Haynes, Marger, Johnson, McCollom & Stolowitz, P.C., Portland, OR, for plaintiff.

Gregory A. Chaimov, Miller, Nash, Wiener, Hager & Carlsen, Portland, OR, for defendant.

AMENDED OPINION

FRYE, District Judge:

The matters before the court are 1) the motion of the defendant, Showco, Inc., to dismiss (# 4-1) or alternatively to transfer (# 4-2); and 2) the motion of the plaintiff, NSI Corporation, to enjoin a subsequently filed suit (# 9).

**FACTS**

Showco, Inc. (Showco) is engaged in the development, manufacture and leasing of sound systems and speakers that are used at live performances and the provision of related services. NSI Corporation (NSI) designs, manufactures and sells microprocessor based lighting controllers and dimmers for lighting systems that are used at live performances.

In 1986, Showco began using the mark PRISM in connection with a new high quality sound system. In 1987, Showco registered the mark PRISM (Reg. No. 1,457,279) with the United States Patent and Trademark Office for "sound equipment namely speakers." The registration is now incontestible under section 15 of the United States Trademark Act (15 U.S.C. § 1065). Showco's PRISM sound system has been used in live performances throughout the United States and elsewhere by musicians. Showco's PRISM sound system is its most important product.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

843 F.Supp. 642
843 F.Supp. 642, 30 U.S.P.Q.2d 1546
(Cite as: 843 F.Supp. 642)

Page 2

In early 1993, NSI filed an application with the United States Patent and Trademark Office to register the mark PRISM after having determined that no other companies in the lighting industry were using it as a trademark.

Showco first became aware that NSI was using the mark PRISM as a result of the publication of NSI's application to register the mark PRISM (Serial No. 74/333, 821) in the May 11, 1993 issue of the *Trademark Official Gazette.* In its application to register the mark PRISM, NSI states that it uses the mark in connection with "portable programmable memory lighting controllers and software and user manuals therefor sold as a unit for use in live performances, entertainment tours and events." Exhibit 1 to Supplemental Declaration of Joseph A. Calvaruso.

Showco became concerned that because it was using the mark PRISM for sound systems at the same type of events that NSI proposed to use the mark PRISM for lighting equipment, there was a likelihood of consumer confusion. As a result, on June 9, 1993, Showco filed a request for an extension of time to oppose the application of NSI for the mark PRISM.

On July 30, 1993, Joseph A. Calvaruso, one of Showco's attorneys, wrote a letter to Alexander C. Johnson, Jr., trademark attorney for NSI, informing NSI of Showco's use of the mark PRISM and demanding that NSI "immediately cease and desist from all use of the PRISM mark" and "withdraw its pending application to register said mark." Exhibit 2 to Declaration of Joseph A. Calvaruso, p. 2. In the letter of July 30, 1993, Calvaruso *644 advised NSI that while Showco was prepared to oppose registration of the mark in the Patent and Trademark Office or to use additional other legal remedies, it would prefer to resolve the conflict amicably.

On August 5, 1993, trademark attorney for NSI contacted Showco's attorney to acknowledge receipt of the letter of July 30, 1993. Showco was informed that NSI was investigating the matter. In early September, counsel for Showco called counsel for NSI to inquire about the status of the matter. At that time, NSI informed Showco that it would be forwarding a settlement proposal.

On September 16, 1993, counsel for NSI sent Showco a settlement proposal pursuant to which

NSI's use of the mark PRISM would be limited. In a declaration submitted to this court, the president of NSI, Larry Lynn, stated:

Recognizing that Showco might still demand that NSI stop using PRISM as demanded in their attorney's July 30 letter, however, we decided we would have to fight rather than switch, and needed to be prepared. I was particularly concerned about suit being filed anywhere that might disrupt our marketing or attending an important tradeshow. Therefore, I authorized the preparation and filing of a complaint, but directed that it not be filed unless and until it looked like Showco would not settle short of NSI ceasing to use PRISM.

Declaration of Larry Lynn, p. 6. Despite the declaration of Lynn on behalf of Showco that he had directed that suit not be filed until it looked like a settlement would not be possible, NSI filed this declaratory judgment action on September 17, 1993, one day after it mailed the settlement offer to Showco.

NSI served the complaint on Showco on October 15, 1993. On the same day, counsel for NSI sent Showco's attorney a copy of NSI's complaint and a renewed offer of settlement. In the letter of October 15, 1993, counsel for NSI stated:

Although it has been three weeks since NSI's settlement proposal, Showco has yet to respond to NSI in any fashion. Thus, it is the lack of communication with Showco and the resulting uncertainty that prompted NSI to file suit. NSI sincerely desires to resolve this matter amicably and forego the expense and disruption of litigation.

Exhibit 4 to Declaration of Joseph A. Calvaruso.

NSI acknowledges that the letter of October 15, 1993 contains several misstatements. The most significant misstatement contained in the letter of October 15, 1993 is the representation of Gerald D. Haynes that the delay of Showco had caused NSI to "file suit" when, in fact, the delay of Showco had prompted NSI only to make service of the suit which had been filed on September 17, 1993. *See* Declaration of Gerald D. Haynes, p. 4.

On October 19, 1993, Showco formally rejected NSI's offer of settlement. On November 2, 1993, Showco sued NSI in the United States District Court for the Northern District of Texas, *Showco, Inc. v. NSI Corp.,* No. CV 2203-R. In that complaint, Showco alleges that the use of the mark PRISM by NSI constitutes trademark infringement, false

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

843 F.Supp. 642                                                                              Page 3
843 F.Supp. 642, 30 U.S.P.Q.2d 1546
**(Cite as: 843 F.Supp. 642)**

designation of origin, and unfair competition under
federal, state and common law and dilution under the
laws of the State of Texas.

## STANDARD OF REVIEW
The Declaratory Judgment Act provides, in relevant
part:
> In a case of actual controversy within its
> jurisdiction ... any court of the United States, upon
> the filing of an appropriate pleading, may declare
> the rights and other legal relations of any interested
> party seeking such declaration, whether or not
> further relief is or could be sought. Any such
> declaration shall have the force and effect of a final
> judgment or decree and shall be reviewable as
> such.

28 U.S.C. § 2201(a). "The Declaratory Judgment Act
does not grant litigants an absolute right to a legal
determination. The decision to grant declaratory
relief is a matter of discretion, even when the court is
presented with a justiciable controversy." _United
States v. Washington, 759 F.2d 1353, 1356 (9th
Cir.1985)_ (citations omitted).

*645[1][2] The doctrine of federal comity is a
discretionary doctrine which permits one federal
district court to decline to exercise jurisdiction over a
matter if a complaint has been filed in another federal
district court. _Church of Scientology v. United States
Dep't of Army, 611 F.2d 738, 749 (9th Cir.1979)._ In
its classic formulation, the doctrine of comity permits
a federal district court to decline to exercise
jurisdiction over a matter if a complaint has
theretofore been filed in another federal district
court. When considering issues raised by the
doctrine of comity, courts are not bound by
technicalities.

## CONTENTIONS OF THE PARTIES
Showco contends that this declaratory judgment
action should be dismissed or transferred to the State
of Texas on the ground that NSI misused the
Declaratory Judgment Act to engage in forum
shopping. In particular, Showco contends that NSI
unfairly used the guise of settlement negotiations to
induce Showco to refrain from filing a lawsuit in the
State of Texas so that NSI could file an action for
declaratory judgment in this court. NSI contends
that because it waited a month after filing this action
to serve the complaint, and did so only after it had
received no response from Showco regarding its offer
of settlement, it did not engage in inequitable
conduct, and therefore the rule of "first-in-time, first-

in-right" applies.

## ANALYSIS AND RULING
[3] In _Mentor Graphics Corp. v. Trimeter
Technologies Corp., 739 F.Supp. 542, 544
(D.Or.1990),_ this court held:
> Ordinarily, there is a presumption in favor of the
> plaintiff's choice of forum. _Piper Aircraft Co. v.
> Reyno, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d
> 419 (1981)._ However, where two parties file
> actions simultaneously, the party seeking
> declaratory judgment stands on equal footing with
> the party seeking the traditional remedy, unless the
> party seeking declaratory judgment unfairly took
> advantage of the other in a race to the courthouse.
> _Ashe v. Pepsico, Inc., 443 F.Supp. 84, 85
> (S.D.N.Y.1977)._

In _Mentor Graphics,_ the complaint of each of the
parties was filed within half an hour of one another.
The day that both of the complaints were filed was
the day after settlement negotiations had broken
down, and the attorney for Trimeter had telephoned
the attorney for Mentor Graphics to inform him that
Trimeter intended to file suit. The evidence showed
that Mentor Graphics drafted its complaint after it
had been informed that Trimeter intended to file
suit. This court found that Mentor Graphics did not
act "in bad faith or in anticipation of Trimeter's
filing" in another state. _Id._ at 544.

Mentor Graphics won a race to the courthouse where
the parties were on equal footing. The facts here
differ from those in _Mentor Graphics._ In this case,
Showco, having been led to believe that settlement
negotiations were in progress, did not know that the
race to the courthouse had begun. NSI filed this
action one day after it mailed its settlement
proposal. The fact that NSI did not serve the
complaint on Showco until nearly a month after it
was filed does not diminish the fact that NSI misled
Showco into delaying the filing of the suit in the
State of Texas. In addition, in the letter of October
15, 1993 to Showco, NSI suggested that NSI's suit
had been filed on October 15, 1993, and that the suit
was filed only in response to Showco's delay, when
the suit had actually been filed on September 17,
1993.

In _Consolidated Rail Corp. v. Grand Trunk W. R.R.
Co., 592 F.Supp. 562, 568 (E.D.Pa.1984),_ a case
similar to this one, the United States District Court
for the Eastern District of Pennsylvania held:
> Grand Trunk maintains that the only reason

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

843 F.Supp. 642
843 F.Supp. 642, 30 U.S.P.Q.2d 1546
(Cite as: 843 F.Supp. 642)

Conrail's complaint was first filed was due to its having misled Grand Trunk into believing it was engaging in good faith settlement discussions. In light of Conrail's unseemly conduct in winning the race to the courthouse when Grand Trunk did not even know there was a race, allowing this action to proceed would condone a misuse of the Declaratory Judgment Act. Accordingly, Grand Trunk's motion to dismiss will be granted.

**\*646** The court in *Associated Mills, Inc. v. Regina Co., 675 F.Supp. 446,448 (N.D.Ill.1987),* similarly refused to recognize an attempt by a plaintiff in a declaratory judgment action to engage in forum shopping:

Finally, in this Court's opinion, AMI's conduct in filing this declaratory judgment action amounted to nothing more that a preemptive strike. AMI should not be rewarded for winning the race to the courthouse. Nor should it be permitted to distort the purpose of a declaratory judgment by using it as a vehicle to secure a forum of its own choosing. Accordingly, this Court denies AMI's emergency motion for a temporary restraining order and, in view of the pending New Jersey action, dismisses this action.

This court concurs with the conclusions of the courts in *Consolidated Rail Corp.* and *Associated Mills, Inc.,* NSI took advantage of the fact that Showco had deferred the filing of expensive and probably protracted litigation because of its belief that settlement negotiations were under way. The settlement offer of NSI, mailed just one day before NSI filed this declaratory judgment action states, in part: "NSI is mindful of the vagaries and expense of litigation and would very much like to resolve this matter amicably." Exhibit C to Declaration of Gerald D. Haynes, p. 2 (letter of September 16, 1993). This statement verifies that Showco's belief that NSI did not intend to file suit, at least until Showco had an opportunity to consider the settlement offer, was a reasonable belief.

NSI argues that Showco delayed in responding to its settlement offer, leaving NSI no option other than to proceed with this declaratory judgment action. However, the facts before the court are that Showco's delay of one month in responding to the settlement proposal is consistent with the usual course of communication between the parties. Further, NSI admits that it was the fear of suit in an inconvenient forum, not Showco's delay in responding to a

settlement offer, that prompted NSI to file this declaratory judgment suit.

## CONCLUSION

Accordingly, the motion of Showco to dismiss (# 4-1) is granted; the alternative motion of Showco to transfer (# 4-2) is denied as moot; and the motion of NSI to enjoin a subsequently filed suit (# 9) is denied.

## AMENDED JUDGMENT

Based on the record, IT IS ORDERED AND ADJUDGED that this action is dismissed.

843 F.Supp. 642, 30 U.S.P.Q.2d 1546

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT H



675 F.Supp. 446
675 F.Supp. 446
(Cite as: 675 F.Supp. 446)

Page 1

United States District Court, N.D. Illinois,
Eastern Division.
ASSOCIATED MILLS, INC., Plaintiff,
v.
The REGINA CO., INC. and Appliance Company of
America, Defendant and
Counterclaimants.
No. 87 C 10319.

Dec. 23, 1987.

Manufacturer sought temporary restraining order
barring competitor's copyright infringement action,
filed subsequent to filing of manufacturer's
declaratory judgment action. The District Court,
Alesia, J., held that infringement suit could proceed
despite prior filing of declaratory judgment action on
same issues, and declaratory judgment action would
be dismissed.

Motion denied, case dismissed.

West Headnotes

**Declaratory Judgment** 362
118Ak362 Most Cited Cases

**Injunction** 32
212k32 Most Cited Cases
Copyright infringement action filed 12 days after
competitor filed declaratory judgment action would
not be enjoined where declaratory judgment action
was filed in anticipation of infringement action;
moreover, declaratory judgment action would be
dismissed in that filing of infringement action
obviated need for declaratory judgment.
*446 Charles A. Laff, Martin L. Stern, Joseph F.
Schmidt, Laff, Whitesel, Conte & Saret, *447 Bruce
M. Friedman, Michael M. Large, Laser, Schostok,
Kolman & Frank, Chicago, Ill., for plaintiff
Associated Mills, Inc.

Robert E. Wagner, Linda A. Kuczma, Wallenstein,

Wagner, Hattis & Strampel, Ltd., Chicago, Ill.,
Walter G. Marple, Jr., Rosemary H. Yeoh, Anderson,
Russell, Kill & Glick, P.C., New York City, for
defendant and counterclaimants--The Regina Co.,
Inc. and Appliance Co. of America.

MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

Plaintiff, Associated Mills, Inc. ("AMI"), filed an
emergency motion for a temporary restraining order
barring the defendant and counterclaimants, The
Regina Co., Inc. and Appliance Corporation of
America (collectively, "Regina") from prosecuting an
action subsequently filed by Regina in the United
States District Court for the District of New Jersey.
For the reasons set forth below, AMI's motion for a
temporary restraining order is denied and this action
is dismissed.

I. *Facts*

AMI is an Illinois corporation which manufactures,
distributes, and sells housewares, including whirlpool
spas. Regina is a New Jersey corporation which also
manufactures, sells, and distributes whirlpool
appliances. In promoting its "HomeSpa Collection,"
Regina uses certain packaging and advertisements
which are protected by a copyright registered with
the United States Copyright Office as No. TX 1 982
352.

On December 1, 1987, counsel for Regina sent a
letter to the president of AMI expressing the belief
that AMI's packaging and advertisements for its
"POLLENEX Whirlpool Hot Spa" infringed Regina's
copyright for its "HomeSpa Collection." In the letter,
Regina's counsel also demanded that AMI cease and
desist distribution of the infringing packaging and
advertisements and that AMI destroy all infringing
packaging and advertisements, as well as all means of
reproducing the infringing materials.

In response to Regina's letter, on December 2, 1987,
counsel for AMI telephoned counsel for Regina.
According to Regina, during that telephone
conversation, the parties reached an accord whereby

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Regina agreed to give AMI a couple of weeks to evaluate its position in exchange for AMI's promise that it would not file a preemptive declaratory judgment action against Regina in Illinois. AMI disputes that the parties reached such an accord.

Nevertheless, on December 3, 1987, AMI filed the instant complaint against Regina seeking, among other relief, a declaratory judgment that AMI's packaging and advertisements do not infringe Regina's copyright. In response, on December 7, 1987, Regina filed an answer, a counterclaim, and a motion for a preliminary injunction. The counterclaim contained multiple counts, including a count for copyright infringement. The motion sought to enjoin AMI from infringement of Regina's copyright pending a trial on the merits.

Regina's motion for a preliminary injunction was scheduled for hearing on December 9, 1987. Because a criminal trial was in progress, the Court continued the motion generally, ordered the parties to resume settlement negotiations, and set the matter for a status hearing on January 29, 1988. The Court also granted Regina leave to file a motion to transfer the action to New Jersey in the interim.

Six days later, on December 15, 1987, Regina filed an action against AMI in the United States District Court for the District of New Jersey ("the New Jersey action"). In the complaint filed in New Jersey, Regina asserted claims against AMI identical to those contained in the counterclaim filed by Regina in Illinois.

After receiving notice of the New Jersey action, AMI filed the instant emergency motion for a temporary restraining order against Regina. In its motion, AMI seeks to restrain Regina from prosecuting the New Jersey action. Regina claims that AMI's motion should be denied and the Illinois action should be dismissed.

**\*448** II. *Discussion*

AMI filed this declaratory judgment action in anticipation of an infringement action by Regina. The issue before this Court is whether the infringement action, filed by Regina twelve days after AMI filed the instant declaratory judgment action in Illinois, should proceed. This Court believes that it should.

The Seventh Circuit recently addressed this issue under circumstances virtually identical to those present in this case in *Tempco Elec. Heater Corp. v. Omega Engineering, Inc.,* 819 F.2d 746 (7th Cir.1987). In *Tempco,* the plaintiff filed a declaratory judgment action in Illinois the same day it received a letter from the defendant demanding that the plaintiff cease the alleged infringement. Four days later, the defendant filed an infringement action of its own in the District of Connecticut. The defendant then moved to dismiss the declaratory judgment action filed in Illinois, claiming that the subsequently filed infringement action in Connecticut involved the same facts, parties, and issues. The district court granted the defendant's motion and dismissed the earlier filed declaratory judgment action.

On appeal, the Seventh Circuit upheld the district court's ruling, recognizing that federal courts have the discretion to decline to hear a declaratory judgment, even though it is within their jurisdiction. *Tempco,* 819 F.2d at 747. In its decision, the court focused on the purposes underlying the declaratory judgment action:

> The purposes of declaratory judgments are to 'clarify and settle the legal relations at issue' and to 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'

*Tempco,* 819 F.2d at 746, 749 (quoting in part Borchard, *Declaratory Judgments* 299 (2d ed. 1941)). Noting that the pending infringement action had caused the controversy to "ripen" to the point where a declaratory judgment would serve no useful purpose, the court held that the district court properly exercised its discretion in declining to hear the earlier filed declaratory judgment action.

The same rationale applies to this case. AMI filed this declaratory judgment action the day after it received a letter from Regina demanding that AMI cease infringement of Regina's copyright. Twelve days later, Regina filed its infringement action in New Jersey. As in *Tempco,* Regina's filing of an infringement action in New Jersey obviated the need for a declaratory judgment in this case.

At the hearing on AMI's emergency motion for a temporary restraining order, counsel for AMI argued that this case is distinguishable from *Tempco* because in this case, AMI has requested relief other than a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

675 F.Supp. 446
675 F.Supp. 446
**(Cite as: 675 F.Supp. 446)**

declaratory judgment in its three-count complaint. According to AMI, this fact is significant because it will be deprived of its right to choose the forum in which to litigate these additional claims if the Court dismisses this action.

We find this argument unpersuasive for several reasons. First, as the court stated in *Tempco,* the mere fact that a party files its declaratory judgment first does not give it a "right" to choose a forum. *Tempco,* 819 F.2d at 750. Furthermore, AMI will be able to assert its additional claims as counterclaims in the New Jersey infringement action. *See* Fed.R.Civ.P. 13. Finally, in this Court's opinion, AMI's conduct in filing this declaratory judgment action amounted to nothing more than a preemptive strike. AMI should not be rewarded for winning the race to the courthouse. Nor should it be permitted to distort the purpose of a declaratory judgment by using it as a vehicle to secure a forum of its own choosing. Accordingly, this Court denies AMI's emergency motion for a temporary restraining order and, in view of the pending New Jersey action, dismisses this action.

### III. *Conclusion*
For these reasons, AMI's emergency motion for a temporary restraining order is denied and this action is dismissed.

IT IS SO ORDERED.

675 F.Supp. 446

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.